# APPENDIX TO DEFENDANT'S MOTION TO DISMISS

Letter from Anna Chong to Brenda Wynne-George dated July 17, 2002 . . . . . . . . . . . . . . . . . . . . 1

Letter from Brenda Wynne-George to Anna Chong dated September 25, 2002 . . . . . . . . . . . . . . . 9

ENGINEERED DEMOLITION, INC.

3901 Schreiber Way
Coeur d'Alene, ID 83815

Phone: (208) 676-9900
Fax: (208) 676-9800

e-mail: implode@bigblast.com
website: www.bigblast.com

July 17, 2002

Brenda Wynne-George
Contracting Officer
U.S. Army Corps
8945 Latty Avenue
Berkley, MO 63134

RE: Contract No. DACW43-01-C-0426 (HISS IV)
Hazelwood Interim Storage Site
Main Pile Removal Action, Phase 2
FUSRAP, St. Louis, MO
Construction/Operations Division

Dear Ms. Wynne-George:

This will acknowledge our receipt on April 22, 2002, of the April 18, 2002, letter of CO Rep. David Mueller denying our claim for equitable adjustment for the HISS Main Pile quantity shortfall. We do not intend to revisit all the factual details of this relatively uncomplicated matter, but request your reconsideration from the standpoint of the applicable law, with particular focus on two areas not directly, fully emphasized or developed.

I want you to know that we are sincerely grateful for your courtesies in this frustrating matter. We are particularly appreciative of your willingness to look beyond the limits of our letter of claim, even though your comprehensive review nevertheless compelled you to find that you could find "no basis within the contract" to support our position. While very appreciative, we are also chagrined, as it is our responsibility to prove the merit of our claim, not your responsibility to do our work for us.

Our time to appeal expires within a few days, so we have had to file a notice of appeal with the ASBCA to preserve our right, but it

is our hope that we can resolve this without having to actually prosecute that appeal.

Our claim was prepared and presented before we fully realized the need for legal assistance in the matter, and I believe fairness

requires that you be given a full opportunity to consider the disposition of the contract that you were assigned the task of administering before going any further. In the hope that this matter can be finally resolved at your level, we respectfully submit that there are two legal bases
that justify relief.

The first involves the absence of a VEQ clause in the contract and the doctrine of contract reformation.

Essentially stated, that doctrine holds that equity will re-write (re-form) the parties' contract to express what they honestly believed they had agreed to and upon which they relied in performing, provided the omitted provision is not illegal or contrary to public policy.

> In general, where a written instrument does not express the true agreement and intention of the parties of the parties thereto, it may be reformed as to any material defect, whether the defect is in regard to a common-law or statutory requisite. 66 Am. Jur.2d, Reformation of Instruments §48, p. 265, 266.

As your denial letter correctly points out, the contract contained no VEQ clause. However, and as we all know, everybody thought it did, and it was only after the shortfall problem arose that it was discovered to be absent. Incidentally, the characterization of the contract as a "services" contract as opposed to a "construction" contract does not mandate the exclusion of a VEQ clause. The very essence of this contract was the disposition of an estimated, not known, quantity of material, but for reasons to be shown later herein, this is largely irrelevant in any event.

Attached as Appendix "A" is a copy of the minutes from the Pre-construction and Mutual Understanding Meeting of February 15, 2001 (and David Mueller's letter of transmittal). This was on HISS III, not HISS IV, but the contracts were identical, and nothing occurred in HISS III to alert any of us to the absence of the VEQ clause. Once the shortfall occurred during HISS IV, we realized the VEQ

clause wasn't included in either of the contract, but it was not a problem during HISS III and wasn't discovered until late in HISS IV. The "mutual understanding" in question is formalized on the first page in paragraph 4: "A VEQ modification at end of contract will adjust the amounts." We fully understand that Mr. Mueller, as CO's Rep., had no authority to modify the contract, as is always the case, and we do not put forth this point in support of an argument to "modify" the contract. We do contend, however, that this is persuasive evidence of the contention that everybody involved honestly believed the contract contained a VEQ clause, although we also do not believe this point has ever been seriously contested.

We therefore submit that the contract should be deemed reformed, pursuant to the doctrine of contract reformation, to reflect the intention and belief of both parties, i.e. that it contained a VEQ clause, and compensation be adjusted accordingly.

This position should not be confused with an effort to import the VEQ clause under the "Christian Doctrine." We know the ASBCA has rejected that argument in a 1997 ruling (Lambrecht & Sons, Inc., ASBCA 49 515, July 7, 1997) and fully understand the basis of that ruling. Their reasoning was that the law would import into a contract a clause that was omitted, but only so long as it was a major clause, what the Board termed a "mandatory" clause "that expresses a significant or deeply ingrained strand of public procurement policy." (For the "Christian Doctrine" see G.L. Christian & Assoc. v. U.S., 312 F.2d 418 (Ct. Cl.), 5 GC ¶57, aff'd on rehearing, 320 F.2d 345 (Ct. Cl.), 5GC ¶325, cert. denied, 375 U.S. 954 (1963), 5GC ¶572). For the reasons it set forth, the Board simply held the VEQ clause did not fit those criteria. Our theory here is entirely different, and invokes the centuries old doctrine of contract reformation. While admittedly not part of the FAR, it should be as available to the adjudicator as all other general legal principles of contract law that the FAR have not specifically revised or rejected.

But, we believe the most appropriate reasoning here is to ignore a VEQ clause, if one were actually present, in favor of a "mandatory" superior clause, since the second point we raise makes the absence of a VEQ clause irrelevant. A substantial body of law exists for the proposition that a VEQ type clause was never intended to be the exclusive remedy in over/underrun situations. The supplementary, secondary nature of the mission of a VEQ clause, that it is "inferior" to other mandatory, "superior" clauses has been noted by a number of courts. In Morrison-Knudsen Co. v. United States 397 F.2d

826, 842 (Ct. Cl. 1968), the Court of Claims stated that "a standard article [e.g. changed conditions/differing site conditions, or changes], incorporated in the agreement, cannot lightly be read out of it, or deprived of most of its normal substance" by using special clauses addressing variation in quantities. The Morrison-Knudsen court was considering whether a significant overrun was to be adjusted under a VEQ clause, or as a contract change.

In an article on the subject, "When is a Variation Not a Variation?" (copyright 1995, Kilcullen, Wilson & Kilcullen), author Chris Jenson states:

> Traditionally, courts have held that standard mandatory clauses, such as changes or differing site condition clauses, rather than quantity variation clauses, control in two situations: (1) where there is a large variation in quantity; or (2) where there is a large difference in the cost of performing the overrun or underrun. Courts generally limit the application of quantity variation clauses to "reasonable" quantity variations, pricing large or abnormal variations resulting from differing subsurface conditions under the standard differing site conditions or changes clauses.

Nearly 50 years ago the First Circuit Court of Appeals, dealing in nomenclature long since superseded, said:

> The additions and deductions' clause was clearly applicable only to those inadvertent errors or differences between careful and precise specifications and performance that will inevitably creep in where contracts involve vast amounts of labor and materials. It does not apply to a change of a substantial nature.' Blair v. United States, 8th Cir., 1945, 147 F.2d 840, 847, *modified* 150 F.2d 676. Plaintiff is here attempting to deduct a sum determined by the unit prices of the additions and deductions' clause from the lump sum price when 52/60ths of the entire work originally planned for the By-pass and Effluent Channel has been canceled. But this type of clause *** is limited in its meaning and effect, by reason, and by the object of the contract, to such modifications of the contemplated work as do not radically change its nature and its costs. ***' Salt Lake City v. Smith, 8 Cir. 1900, 104 F. 457, 465. It is designed to cover a variation, not a transformation.' (citation omitted).

210 F.2d 62, 66 (1st Cir. 1954).

The distinction we address here is not unique to Federal contract law. In Ray D. Lowder, Inc. v. N.C. State Hwy Commission, 217 S.E.2d 682, (N.C. App. 1975) the North Carolina court stated:

> There is no obligation to proceed under sec. 4.3B [quantities clause]. That section decides how a contractor may be compensated; it does not dictate how he must be compensated. Although sec. 4.3B is designed to smooth over problems arising when overruns or underruns occur, it does not, by virtue of that fact, indicate that recovery is not available under sec. 4.3A [differing site condition] when the cost of doing unforeseen added work greatly differs from the stated unit price. Id, at 695. (Emphasis added)

Similarly, in *Continental Drilling Co.*, ENG BCA No. 3455, the Corps Board said:

> A material variation, not reasonably foreseeable, between the quantity of work set forth in the contract and that actually done is a differing site condition within the purview of the Differing Site Conditions clause. *Schutt Construction Co. v. United States*, 173 Ct. Cl. 836 (1965). Neither the Variation in Estimated Quantities clause nor the Measurements and Payment clause has any effect on this legal principle when, as in the present case, the cost of doing the work differs significantly from the unit price in the contract.

75-2 BCA ¶ 11,541.

In an article "Deductive Changes", Briefing Papers, Second Series, No. 01-8, July 2001, West Group, Washington, D.C. lawyer and Registered Professional Engineer, John C. Person writes upon the subject of deductive charges vs. "VEQ" clause:

> What happens, however, where the quantities in a unit-priced contract are reduced below the estimated values by a deductive change? Is there concurrent applicability of the "VEQ" clause and the "changes" clause, or does one clause have primary over the other? Is any resulting price adjustment limited to cost increases to those quantities that fall outside the "VEQ" window? Fortunately, the

courts and boards have considered this issue and have held generally that presence or absence of the "VEQ" clause has no bearing on the scope of recovery for a deductive change. In one case, the Department of the Interior Board held that the presence of a "VEQ" clause with a (+/-) 25% window did not preclude the contractor's recovery of an equitable adjustment under the "Changes" clause for unforeseen costs even though the additional quantities fell within the "VEQ" no-charge window. J.A. LaPorte, Inc., IBCA-1014-12-73, 75-2 BCA ¶ 11,486, 17 GC ¶ 505; see also Morrison-Knudsen Co., IBCA-36 et al., 57-1 BCA ¶ 1264.

In another case, the ENGBCA was presented with what the parties believed was a choice of applying a "VEQ" clause to either a 19% reduction in cement quantities, as argued by the contractor, or a 4% reduction, as argued by the Government. The board found that the parties had "Chosen the wrong battlefield" by confining their analysis to the "VEQ" clause. Rather, it held that the contractor was entitled to an equitable adjustment under the "Changes" clause. C.H. Leavell & Co., ENGBCA 3492, 75-2 BCA ¶ 11,596, 18 GC ¶ 43.

When the actual cost of unit price work differs greatly because of unforeseen factors, repricing is proper whether or not VEQ limits have been met. Further, the repricing may apply not only to the overrun underrun quantity, but may also include some or all of the original estimated quantity. See Loftis v. United States, 76 F. Supp. 616 (Ct. Cl, 1948); Dunbar & Sullivan Dredging Co., ENG BCA 3165, 73-2 BCA ¶ 10,285.

In any event, whether adjustments are made via the differing site condition clause, the changes clause, or the VEQ clause, the abiding emphasis has always been on the modifier "equitable." By the literal terms of these contracts, if any adjustments are to be made then they must be "equitable." The Maryland Appellate Court's statement in Genstar Stone Paving Products Co. v. State Highway Admin., 618 A.2d 256 (Md. App. 1993) typifies the philosophy of the various agency boards of contract appeals, the Court of Claims, State Appellate Courts, and the Federal Circuit:

Apart from the determination of costs, additional leeway is implicit from the equitable nature of the adjustment and the fact that it is merely to be based on and not necessarily equivalent to the cost differential. Keeping a

> contractor whole does not require that it be given an excessive profit based on its use of creative accounting in devising its item bid; nor does it allow the Board to cause injury to the contractor by refusing to compensate it for unit costs legitimately incurred by reason of a significant change in the scope of the work upon which the contractor bid.
>
> The standard, being an equitable one, needs to be flexible in its application. It is not to be applied so rigidly as both the Board and the court, in their very different ways, applied it. (emphasis added)

Thus, we submit, there exist two separate and independent valid bases upon which the contract price may legitimately and properly be equitably adjusted, without which adjustment the compensation to this firm, viewed in context with the value delivered to the Government, would be the antithesis of "equitable."

As we earlier argued above, we respectfully submit that the differing site condition, or changes (or even constructive changes) clauses (only one of course) is most applicable here as opposed to an included-by-reformation VEQ clause.

The two major line items of compensation in this contract were excavation and transportation - indeed, loading the contaminated earth and transporting it to a safe, approved site was the only purpose of the contract. Additionally, this was the only contract this small 8(a) firm had at the time, and it was intended to carry <u>our entire</u> home office overhead and, hopefully, supply whatever profit there was to be made during that period. We spread our overhead (home office as well as field) over the estimated quantities (33%). But when suddenly the dirt was all gone, and we were far short of the estimate, we had failed to recoup the home office overhead intended and simply had to pack up and go home.

The shortfall in excavation was 1,407.27 cu. yds. At $49/yd, the "lost" compensation would have been $68,956.23 for the excavation. ENDE's unrecouped overhead on excavation computes to 33% of the above or $22,755.55. The shortfall on transportation is 3,161.08 cu. yds. at $125.50/yd., or $396,715.54. ENDE's unrecouped overhead for this element of work is 10% or $39,671.55, for a total unrecouped overhead of $62,427.10.

You already have the computational element of our early quasi-VEQ claim, so I won't repeat that here. I any case, as I said, we

truly feel the appropriate equitable adjustment is under the differing site conditions or changes clause. The fact situation is classic DSC. Everybody looked at the pile, the Corps surveyed it, and there was utterly no clue to anybody, until we actually came to the end of it, that the estimated quantity wasn't accurate.

A separate item that we didn't present to you in our first submission concerns a cost incurred by our rail car subcontractor, Greenfield Logistics, LLC. They rented rail cars in anticipation of the estimated quantity, and as a result have incurred a cost therefore in the sum of $38,940.00 for rail cars rented but sent back unused when the pile was exhausted.

If that firm has not presented this claim for equitable adjustment to you, please consider this on their behalf. If allowed, please then consider our claim for $6,619.80 for our allowed markup.

Once again, I thank you for the very professional and courteous treatment ENDE received in your administration of this contract.

Sincerely,

Engineered Demolition, Inc.

By: ______________________
Anna Chong, President

AC/mjh

DEPARTMENT OF THE ARMY
ST. LOUIS DISTRICT, CORPS OF ENGINEERS
1222 SPRUCE STREET
ST. LOUIS, MISSOURI 63103-2833

REPLY TO
ATTENTION OF:

September 25, 2002

Contracting Division

SUBJECT: Final Contracting Officer's Determination
Contract No. DACW43-010C-0426
Main Pile Removal Action, Phase 2

Engineered Demolition, Inc.
Attn: Anna Chong, President
3901 Schreiber Way
Coeur d'Alene, Idaho 83815

Dear Ms. Chong:

I am writing in response to correspondence dated July 17, 2002 regarding your request on behalf of Engineered Demolition, Incorporated ("ENDE") for additional payment under Contract No. DACW43-010C-0426 (the "Contract"). This letter also serves as response to correspondence from your General Counsel, Mr. Craig Kosonen, dated September 18, 2002. The request is denied.

The St. Louis District entered into a supplies/services contract with ENDE for the removal, transportation and disposal of contaminated soils at the Hazelwood Interim Storage Site. There were only two variable quantity line items specified in the Contract, the main pile removal and the disposal-rail transportation of the contaminated soils. The unit prices stated in the contract for these two items were $49.00 and $125.50 per cubic yard respectively.

The terms of payment are clear on the face of the Contract. Both unit price payment items are covered by the following general clause:

> "Payment items for the work of this Contractor on which the contract unit price payments will be made are listed in the BIDDING SCHEDULE and described below. The unit price and payment made for each item listed shall constitute full compensation for furnishing all labor, materials and equipment, and performing any associated Contractor quality control, environmental protection, safety requirements, tests and reports, and for performing all work required for each of the unit price items."



Printed on Recycled Paper

Contract, §01025, ¶ 1.3. Further, payment for main pile removal is specified as:

> "The amount paid for will be the actual number of cubic yards of material, measured in its original position and removed from the pile, which is acceptably disposed of as herein specified . . . The unit of measurement for removal will be in-place cubic yards, computed by the difference in topographic surveys taken by the Government before and after the removal of the Main Pile."

Contract, §01025, ¶ 1.3.1. Payment for disposal-rail transportation is specified as:

> "Payment will be made for all costs associated with the transportation of waste. Disposal fees are not part of this contract. All work and costs involved with the transportation, by rail, to the disposal site are to be included in this item."

Contract, §01025, ¶ 1.3.2. There can be no mistake regarding the plain meaning of these contract terms. This is a service contract for removal, transportation and disposal of contaminated soils, and payment is made based on the quantities removed, transported and disposed. With the exception of lump sum items bid separately, the unit price is all-inclusive. No additional overhead, materials, profit or other consideration is contemplated or approved.

In your correspondence you cited two potential legal bases for relief. Your first basis involved utilizing the common law theory of reformation of contract to afford the inclusion of a variation in estimated quantities ("VEQ") clause. Your second basis necessitates the importation of a differing site conditions ("DSC") clause. The Contract contains neither a VEQ clause nor a DSC clause. I have discussed your contentions with my Office of Counsel, and will address each in turn.

We are in agreement that the Contract clearly has no VEQ clause. In fact, Page 1 of the "Bidding Schedule Notes" states:

> "All quantities shown on the SUPPLIES OR SERVICES AND PRICE/COSTS are estimated quantities except when the unit is shown as lump sum."

There was no misunderstanding or mutual mistake regarding the inclusion of a VEQ clause. The government did not include a VEQ clause and had no intention of including one. It appears your only support for the allegation of mistake was a statement made by Mr. Dave Mueller, the Contracting Officer's Representative ("COR"), during a preconstruction meeting for a *prior* contract in which he describes how final payment will be made. You state in your correspondence, and I agree, that Mr. Mueller as COR

has no authority to unilaterally add a VEQ clause to the contract. Addition of a VEQ clause would be a contract modification, and only contracting officers acting within the scope of their authority may execute contract modifications. FAR 43.102; *Hensel Phelps Constr. Co.*, GSBCA Nos. 14744, 14877, 01-1 BCA ¶31,249; *Daly Const., Inc.*, ASBCA No. 34322, 92-1 BCA 1 ¶24,469; *Commercial Contractors, Inc.*, ASBCA No. 30675, 88-3 BCA ¶20,877.

Additionally, Mr. Mueller's comments at the preconstruction meeting, when taken in context, support our contention that ENDE was fully aware of the payment process. Mr. Mueller outlined that progress payments for soils removed would be made, but final payment would be adjusted up or down based on survey data at the end of the contract. The estimated quantity was just that, an estimate, and variations were to be expected. Payments were to be based on the actual surveyed quantity of soil removed, transported and disposed. Finally, the comments you cite were made in regard to a different and wholly separate contract to the one at issue.

You also correctly state that the Christian Doctrine is inapplicable to this dispute. The Christian Doctrine stands for the proposition that clauses required by statute or regulation will be incorporated into a contract by operation of law. *G. L. Christian & Assoc. v. U. S.*, 312 F.2d 418, *cert. denied*, 375 U. S. 954 (1963). A VEQ clause is not required by statute or regulation, and is frequently omitted in a services contract of the type entered into with ENDE.

In short, a VEQ clause is not present in the contract, nor was one intended. There is no legal basis for me to import such a clause as a method to authorize additional payment to ENDE. In your correspondence to me, you also appear to have reached the same conclusion and discounted the merits of the VEQ argument by your statement " . . . we respectfully submit that the differing site condition, or changes (or even constructive changes) clauses (only one of course) is the most applicable here as opposed to an included-by reformation VEQ clause." ENDE Letter, July 7, 2002, p. 7.

Your second proposed legal basis hinges on implying the inclusion of a DSC clause where none is explicit in the Contract. Again, this proposal must be rejected. The DSC clause is included in some construction contracts to account for latent or subsurface conditions that differ materially from those indicated in the contract (*see Meredith Const. Co.*, ASBCA No. 40839, 93-1 BCA ¶25,399; *Caesar Constr., Inc.*, ASBCA No. 41059, 91-1 BCA ¶23,639) or when conditions encountered were unusual and unknown at the time of contracting (*see Walser v. U. S.*, 23 Cl. Ct. 591 (1991); *Gulf Coast Trailing Co.*, ENG BCA No. 5795, 94-2 BCA ¶26,921; *Soletanch Rodio Nicholson*, ENG BCA No. 5796, 94-1 BCA ¶ 26,472). Even if a DSC clause had been included in the Contract,

neither condition was met. There have been no allegations of a latent defect or unusual conditions. To the contrary, the pile to be removed was in clear view, was familiar to ENDE personnel, and consisted of materials as the government represented.

The Christian Doctrine is likewise inapplicable to the addition of a DSC clause. As stated *supra*, this doctrine only applies to clauses required by statute or regulation. A DSC clause does not fall into this classification, and, like the VEQ clause, is only rarely included in a services contract of the type entered into with ENDE.

To summarize, the Contract was a services contract for the removal, transport and disposal of contaminated soils. The variable quantities were clearly identified as estimates, and ENDE, through its past dealings with the Corps, knew or should have known exactly how payment was to be made. There is no ambiguity in the contract, no clauses were inadvertently omitted, and no clauses are required to be impliedly included. If there is no ambiguity within the four corners of a contract, extrinsic evidence is not to be considered. *C. Sanchez & Son, Inc. v. U. S.*, 24 Cl. Ct. 14 (1991), rev'd on other grounds, 6 F. 3d 1539 (Fed. Cir. 1993); *D & L Constr. Co.*, AGBCA No. 97-205-1, 00-1 BCA ¶31,001; *Skyline Technical Constr. Servs.*, ASBCA No. 51076, 98-2 BCA ¶29,888. Accordingly, ENDE's claim for additional consideration is denied.

This notice constitutes a final decision of the Contracting Officer. Decisions on disputes, questions of fact, and other questions are subject to the procedures of the Disputes Clause 52.233-1. If you wish to make such and appeal from this decision, written notice thereof (in triplicate) must be mailed or otherwise furnished to the Corps of Engineers, Board of Contract Appeals, 441 G Street NW, Washington, DC 20314, within 90 days from the date you receive this decision. A copy of any appeal shall be furnished to the Contracting Officer. Such notice should indicate that an appeal is intended and should reference the contract by number. The rules of the Corps of Engineers Board of Contract Appeals are docketed. In lieu of appealing to the Corps of Engineers Board of Contract Appeals, you may bring action directly to the U. S. Claims Court within 12 months of the date your receive this decision.

Please feel free to contact me at 314-331-8500, or Mr. Mark Wunsch or Ms. Beth Pitrolo of our Office of Counsel at 314-331-8191, if you have any additional comments or concerns.

Sincerely,

Brenda Wynne-George
BRENDA WYNNE-GEORGE
Contracting Officer

Copies Furnished:
Ms. Sharon Cotner, CEMVS-FUSRAP
Mr. Mark Wunsch, CEMVS-OC
Mr. Craig Kosonen, ENDE General Counsel