3143318746 P.02

**DEPARTMENT OF THE ARMY**
ST. LOUIS DISTRICT, CORPS OF ENGINEERS
1222 SPRUCE STREET
ST. LOUIS, MISSOURI 63103-2833

REPLY TO
ATTENTION OF:

September 6, 2001

Contracting Division

SUBJECT: Contract No. DACW43-01-C-0426 for Hazelwood Interim Storage Site (HISS), Main Pile Removal Action, Phase 2, North Half, FUSRAP, St. Louis, Missouri

Ms. Anna J. Chong, President
Engineered Demolition, Inc.
695 Capstone Ct., Suite A
PO Box 1838
Hayden Lake, Idaho 83835

Dear Ms. Chong:

This letter serves as your notification to begin work under referenced contract. **One copy of this notice should be signed, dated and returned.**

If you have any questions or need additional information, please contact Ms. Jo Ann C. Moritz, Contract Specialist, at (314) 331-8507.

Sincerely,

Brenda Wynne-George
Contracting Officer

Enclosures

We hereby acknowledge receipt of notification to begin work under Contract No. DACW43-01-C-0426 as of the date indicated on the FAX transmittal which accompanied this notice.

ENGINEERED DEMOLITION, INC.

By ____________
Title President
Receipt Date Sept 6, 2001

cf: CO-CF

TOTAL P.02



B-15

DEPARTMENT OF THE ARMY
ST. LOUIS DISTRICT, CORPS OF ENGINEERS
8945 LATTY AVENUE
BERKELEY, MISSOURI 63134

October 1, 2001

FUSRAP/HISS

HISS 0003

SUBJECT: Contract No. DACW43-01-C-0426, Hazelwood Interim Storage Site (HISS), Main Pile Removal, Phase 2, FUSRAP, St, Louis, Missouri, September 27th Coordination Meeting

Bill Welch, Sr. Project Manager
Engineered Demolition, Inc.
695 Capstone Ct., Suite A
P.O. Box 1838
Hayden Lake, Idaho 83835

Dear Mr. Welch:

Enclosed are copies of the Memorandum for Record from the coordination meeting held on September 27, 2001. I request that you make distribution of the enclosed copies to your staff and subcontractors. Please review and provide me comments by October 9, 2001.

Sincerely,

David E. Mueller

David E. Mueller, PE
Authorized Representative
of the Contracting Officer

Attach

CF: CEMVS-CT-Y
Mike Noble
File

CO-CF 27 September 2001

MEMORANDUM FOR RECORD

SUBJECT: Contract No. DACW43-01-D-0426, HISS Main Pile Removal Phase 2, FUSRAP, St. Louis, MO, ENDE, Coordination Meeting

1. A coordination meeting was held on 27 September 2001 in the Tech Trailer No. 1 Conference Room. Present were:

ENDE

Anna Chong – President
Bill Welch – Project Manager
John Williams – CQC System Manager
Russell Lewis – TDC
Jack McGiven

USACE

Lou Dell'Orco – Project Engineer
Dave Mueller – COR
Sonny Roberts – Project Manager

HAZMED

Dan Wilson – Environmental Engineer
Mike Noble- QA Representative

2. The following items were discussed:

A. Cracks in the Fiberglass Lids – This issue had been discussed and resolved earlier but was revisited because Sonny Roberts will be responsible for signing the manifests this week while Robin Parks is out. The lids will be repaired per the manufacturer's recommendations. Any through cracks will be caulked using silicone caulk. Larger holes will be evaluated on a case-by-case basis.

B. Final Grading Plan – Per previous discussion the low area cause by over excavation on the previous contract would be filled using material from the pile. ENDE will use the flow line of the West ditch as the starting point and run a two percent slope back to where it meets the existing haul road at the East and the granular fill at the North. The entire area will flow to the West with no standing water. A swale along the East and North edges is acceptable as long as the back slopes are no steeper than a three to one. The entire area will be covered with reinforced poly and then two inches of stone.

C. Certification For Pay Estimate No. 2 – ENDE provided Dave Mueller with the required copies.

D. Subcontractor Forms - ENDE provide Dave Mueller with the required SF 1413 forms.

E. Topsoil – Dave Mueller informed ENDE that USACE is considering eliminating the spreading of the two topsoil stockpiles. Per negotiations the topsoil was to be spread and hydro-seeded. USACE is considering disposal off site.

F. Saturday Work – Bill Welch said that they had not decided as yet but would let USACE know this evening whether they plan to work Saturday.

G. Waste Oil – A sample has been taken and sent to the lab for analysis. Dave Mueller has asked that it be disposed of as soon as possible.

H. Electronic Copy of the Shipping Log – Dave Mueller asked ENDE to provide him an electronic copy of the shipping log. He will use it to check the disposal contract billings.

I. Schedule – Reviewed the current schedule. Scheduled to complete pile removal on 17 October 2001. Dave Mueller questioned that they had allotted only two weeks for deconning. Bill Welch said based on there past experience they feel it is adequate. Their current schedule shows them completing the entire project on 22 November 2001. The current Contract Completion Date is 6 December 2001.

J. Plans – ENDE still needs to submit the SOPs associated with the Radiation Protection Plan. Bill Welch said they are the same ones that were submitted under the last contract. He said they would make copies and submit them.

K. Better Coordination Between ENDE and USACE – Discussions ensued concerning several incidents that have occurred with respect to roles and responsibilities. ENDE stated that they are concerned with USACE's strict interpretation concerning the limits of the CQCM System Manager's duties. USACE was concern that the QA representative is finding the majority of deficiencies instead of the CQCSM. USACE was also concerned with a perceived lack of action by ENDE on these noted deficiencies. ENDE said they have been working to resolve them but the majority of the items were minor.

Following discussion both parties agreed to try and improve coordination. USACE will bring noted deficiencies to the CQCSM's attention immediately. We will continue to try and worked out minor issues at the field level. Any unresolved issues will be brought to the Project Manager's and COR's attention immediately. The CQCSM will spend additional time observing the ongoing operations and performing quality control.

L. SSHO – ENDE asked permission to combine the duties of the SSHO and the RSO into one. USACE asked them to make this request in writing prior to taking any action.

David E. Mueller
DAVID E. MUELLER
FUSRAP Area Engineer

**Engineered Demolition, Inc.**
**3901 Schreiber Way**
**Coeur d'Alene, ID, 83835**
(208)772-2600 Fax (208)772-1900

February 10, 2002

C0426-ENDE02

ATT: David Mueller
Department of the Army
St. Louis District, COE
1222 Spruce St.
St. Louis, MO 63103-2833

**REF:**DACAW43-01-C-0426 For Hazelwood Interim Storage Site (HISS) Main Pile Removal Action, Phase 2, FUSRAP, St. Louis, MO

**SUBJECT:** Change in Quantity for excavation & Shipment

Mr. Mueller,

As you are aware the quantity of material scheduled for Excavation, Load out, and Transport for disposal, on this contract, has fallen substantially short of the estimated quantity provided by the USACE in your design documents, and substantially short of the quantity for which we based our negotiations.

This difference is nearly 30% of the total anticipated quantity. The costs negotiated for these two line items, providing payment to ENDE for services performed on this contract, constitute nearly 75% of the total contract value. If there was ever a need for recovery based on variations in estimated quantities, it exists here.

We ask you to consider the following facts;

- These are the highest dollar value line items
- This element of work is a relatively short duration. Less than half of the total contract duration.
- Had ENDE loaded out the remaining quantities suggested to be present during our Contract negotiations, we would have only been on site a maximum of another 10 working days.
- Because of the high dollar value of these line items this is the primary source of overhead recovery and profit allocation on this contract.

Our anticipated overhead expenditures remain unchanged, without the opportunity to recover 30% of the largest allocated portion of overhead due to the above described condition. Absent the VEQ clause in this contract we seek recovery of unabsorbed overhead and direct costs through the Changes Clause, as provided in this Contract. ENDE considers this to b e a material change in our Contract. Had the actual quantity been known during the Contract negotiations, unit prices as well as other costs could have been adjusted to assure all direct jobsite and home office overhead costs were

TOTAL P.03



covered. Respectively, we seek a equitable adjustment for the unabsorbed overhead, direct costs and profit loss as outlined below.

| | | |
|---|---|---|
| 1. | Unused balance on Contract | $ 465,426.77 |
| 2. | 10 additional days (not used) | $ (113,087.60) |
| 3. | 30 rail cars not used at full discounted rate of $7,650.00ea | $ (229,500.00) |
| 4. | Add cost for cars returned (see attached billing) | $ 38,940.00 |
| | **TOTAL ADJUSTED VALUE** | **$161,729.16** |

As indicated above this amount represents the adjusted balance which ENDE would have received had the actual quantities for which the negotiations were based been utilized.

If you have any questions, please do not hesitate to call.

Sincerely

Bill Welch
VP Chief of Operations
ENDE
bill@bigblast.com

cc: Anna Chong/file

DEPARTMENT OF THE ARMY
ST. LOUIS DISTRICT, CORPS OF ENGINEERS
8945 LATTY AVENUE
BERKELEY, MISSOURI 63134

REPLY TO
ATTENTION OF:

April 18, 2002

Subject: Contract No. DACW43-01-C-0426, for Hazelwood Interim Storage Site (HISS), Main Pile Removal Action, Phase 2, FUSRAP, St. Louis, MO
Construction / Operations Division

Mr. Bill Welch
Engineered Demolition, Inc.
3901 Schreiber Way
Coeur d'Alene, ID 83835

Dear Mr. Welch:

I am writing in reply to your letter of February 10, 2002 in which you requested an equitable adjustment of $161,729.16 on behalf of your company for the subject contract. The basis of your claim is that less material was excavated from the HISS Main Pile than had been anticipated. You state that ENDE had fixed overhead for this job and had to return unused railcars as a result of the lesser quantity of material excavated.

The Corps' Claims Team, comprised of the Contracting Division, Office of Counsel and myself met to consider this claim. The Claims Team's determination was that we had no basis within the contract to find merit for your claim. Your very letter points out that this contract did not have a "Variation in Estimated Quantities" (VEQ) clause. The ENDE contract was a services contract and not a construction contract, hence no VEQ clause. Nor do we find a mechanism, within the Federal Acquisition Regulation (FAR), to compensate your company for "unabsorbed overhead" or "anticipated profit".

Should you have additional questions about this determination, you may contact myself at (314) 260-3930 or Mr. Mark Wunsch, Assistant District Counsel, at (314) 331-8732.

Sincerely,

David E. Mueller

David E. Mueller, P.E.
Contracting Officer's Representative

RECEIVED
APR 22 2002

**ENGINEERED DEMOLITION, INC.**

3901 Schreiber Way
Coeur d'Alene, ID 83815

Phone: (208) 676-9900
Fax: (208) 676-9800

e-mail: implode@bigblast.com
website: www.bigblast.com

July 17, 2002

Brenda Wynne-George
Contracting Officer
U.S. Army Corps
8945 Latty Avenue
Berkley, MO 63134

RE: Contract No. DACW43-01-C-0426 (HISS IV)
Hazelwood Interim Storage Site
Main Pile Removal Action, Phase 2
FUSRAP, St. Louis, MO
Construction/Operations Division

Dear Ms. Wynne-George:

This will acknowledge our receipt on April 22, 2002, of the April 18, 2002, letter of CO Rep. David Mueller denying our claim for equitable adjustment for the HISS Main Pile quantity shortfall. We do not intend to revisit all the factual details of this relatively uncomplicated matter, but request your reconsideration from the standpoint of the applicable law, with particular focus on two areas not directly, fully emphasized or developed.

I want you to know that we are sincerely grateful for your courtesies in this frustrating matter. We are particularly appreciative of your willingness to look beyond the limits of our letter of claim, even though your comprehensive review nevertheless compelled you to find that you could find "no basis within the contract" to support our position. While very appreciative, we are also chagrined, as it is our responsibility to prove the merit of our claim, not your responsibility to do our work for us.

Our time to appeal expires within a few days, so we have had to file a notice of appeal with the ASBCA to preserve our right, but it

is our hope that we can resolve this without having to actually prosecute that appeal.

Our claim was prepared and presented before we fully realized the need for legal assistance in the matter, and I believe fairness

requires that you be given a full opportunity to consider the disposition of the contract that you were assigned the task of administering before going any further. In the hope that this matter can be finally resolved at your level, we respectfully submit that there are two legal bases that justify relief.

The first involves the absence of a VEQ clause in the contract and the doctrine of contract reformation.

Essentially stated, that doctrine holds that equity will re-write (re-form) the parties' contract to express what they honestly believed they had agreed to and upon which they relied in performing, provided the omitted provision is not illegal or contrary to public policy.

> In general, where a written instrument does not express the true agreement and intention of the parties of the parties thereto, it may be reformed as to any material defect, whether the defect is in regard to a common-law or statutory requisite. 66 Am. Jur.2d, Reformation of Instruments §48, p. 265, 266.

As your denial letter correctly points out, the contract contained no VEQ clause. However, and as we all know, everybody thought it did, and it was only after the shortfall problem arose that it was discovered to be absent. Incidentally, the characterization of the contract as a "services" contract as opposed to a "construction" contract does not mandate the exclusion of a VEQ clause. The very essence of this contract was the disposition of an estimated, not known, quantity of material, but for reasons to be shown later herein, this is largely irrelevant in any event.

Attached as Appendix "A" is a copy of the minutes from the Pre-construction and Mutual Understanding Meeting of February 15, 2001 (and David Mueller's letter of transmittal). This was on HISS III, not HISS IV, but the contracts were identical, and nothing occurred in HISS III to alert any of us to the absence of the VEQ clause. Once the shortfall occurred during HISS IV, we realized the VEQ

clause wasn't included in either of the contract, but it was not a problem during HISS III and wasn't discovered until late in HISS IV. The "mutual understanding" in question is formalized on the first page in paragraph 4: "A VEQ modification at end of contract will adjust the amounts." We fully understand that Mr. Mueller, as CO's Rep., had no authority to modify the contract, as is always the case,

and we do not put forth this point in support of an argument to "modify" the contract. We do contend, however, that this is persuasive evidence of the contention that everybody involved honestly believed the contract contained a VEQ clause, although we also do not believe this point has ever been seriously contested.

We therefore submit that the contract should be deemed reformed, pursuant to the doctrine of contract reformation, to reflect the intention and belief of both parties, i.e. that it contained a VEQ clause, and compensation be adjusted accordingly.

This position should not be confused with an effort to import the VEQ clause under the "Christian Doctrine." We know the ASBCA has rejected that argument in a 1997 ruling (Lambrecht & Sons, Inc., ASBCA 49 515, July 7, 1997) and fully understand the basis of that ruling. Their reasoning was that the law would import into a contract a clause that was omitted, but only so long as it was a major clause, what the Board termed a "mandatory" clause "that expresses a significant or deeply ingrained strand of public procurement policy." (For the "Christian Doctrine" see G.L. Christian & Assoc. v. U.S., 312 F.2d 418 (Ct. Cl.), 5 GC ¶57, aff'd on rehearing, 320 F.2d 345 (Ct. Cl.), 5GC ¶325, cert. denied, 375 U.S. 954 (1963), 5GC ¶572). For the reasons it set forth, the Board simply held the VEQ clause did not fit those criteria. Our theory here is entirely different, and invokes the centuries old doctrine of contract reformation. While admittedly not part of the FAR, it should be as available to the adjudicator as all other general legal principles of contract law that the FAR have not specifically revised or rejected.

But, we believe the most appropriate reasoning here is to ignore a VEQ clause, if one were actually present, in favor of a "mandatory" superior clause, since the second point we raise makes the absence of a VEQ clause irrelevant. A substantial body of law exists for the proposition that a VEQ type clause was never intended to be the exclusive remedy in over/underrun situations. The supplementary, secondary nature of the mission of a VEQ clause, that it is "inferior" to other mandatory, "superior" clauses has been noted by a number of courts. In Morrison-Knudsen Co. v. United States 397 F.2d

826, 842 (Ct. Cl. 1968), the Court of Claims stated that "a standard article [e.g. changed conditions/differing site conditions, or changes], incorporated in the agreement, cannot lightly be read out of it, or deprived of most of its normal substance" by using special clauses addressing variation in quantities. The Morrison-Knudsen court was considering whether a significant overrun was to be adjusted under a VEQ clause, or as a contract change.

In an article on the subject, "When is a Variation Not a Variation?" (copyright 1995, Kilcullen, Wilson & Kilcullen), author Chris Jenson states:

> Traditionally, courts have held that standard mandatory clauses, such as changes or differing site condition clauses, rather than quantity variation clauses, control in two situations: (1) where there is a large variation in quantity; or (2) where there is a large difference in the cost of performing the overrun or underrun. Courts generally limit the application of quantity variation clauses to "reasonable" quantity variations, pricing large or abnormal variations resulting from differing subsurface conditions under the standard differing site conditions or changes clauses.

Nearly 50 years ago the First Circuit Court of Appeals, dealing in nomenclature long since superseded, said:

> The additions and deductions' clause was clearly applicable only to those inadvertent errors or differences between careful and precise specifications and performance that will inevitably creep in where contracts involve vast amounts of labor and materials. It does not apply to a change of a substantial nature.' Blair v. United States, 8th Cir., 1945, 147 F.2d 840, 847, *modified* 150 F.2d 676. Plaintiff is here attempting to deduct a sum determined by the unit prices of the additions and deductions' clause from the lump sum price when 52/60ths of the entire work originally planned for the By-pass and Effluent Channel has been canceled. But this type of clause *** is limited in its meaning and effect, by reason, and by the object of the contract, to such modifications of the contemplated work as do not radically change its nature and its costs. ***' Salt Lake City v. Smith, 8 Cir. 1900, 104 F. 457, 465. It is designed to cover a variation, not a transformation.' (citation omitted).

210 F.2d 62, 66 (1st Cir. 1954).

The distinction we address here is not unique to Federal contract law. In Ray D. Lowder, Inc. v. N.C. State Hwy Commission, 217 S.E.2d 682, (N.C. App. 1975) the North Carolina court stated:

> There is no obligation to proceed under sec. 4.3B [quantities clause]. That section decides how a contractor
>
> may be compensated; it does not dictate how he must be compensated. Although sec. 4.3B is designed to smooth over problems arising when overruns or underruns occur, it does not, by virtue of that fact, indicate that recovery is not available under sec. 4.3A [differing site condition] when the cost of doing unforeseen added work greatly differs from the stated unit price. Id, at 695. (Emphasis added)

Similarly, in *Continental Drilling Co.*, ENG BCA No. 3455, the Corps Board said:

> A material variation, not reasonably foreseeable, between the quantity of work set forth in the contract and that actually done is a differing site condition within the purview of the Differing Site Conditions clause. *Schutt Construction Co. v. United States*, 173 Ct. Cl. 836 (1965). Neither the Variation in Estimated Quantities clause nor the Measurements and Payment clause has any effect on this legal principle when, as in the present case, the cost of doing the work differs significantly from the unit price in the contract.

75-2 BCA ¶ 11,541.

In an article "Deductive Changes", Briefing Papers, Second Series, No. 01-8, July 2001, West Group, Washington, D.C. lawyer and Registered Professional Engineer, John C. Person writes upon the subject of deductive charges vs. "VEQ" clause:

> What happens, however, where the quantities in a unit-priced contract are reduced below the estimated values by a deductive change? Is there concurrent applicability of the "VEQ" clause and the "changes" clause, or does one clause have primary over the other? Is any resulting price adjustment limited to cost increases to those quantities that fall outside the "VEQ" window? Fortunately, the

> courts and boards have considered this issue and have held generally that presence or absence of the "VEQ" clause has no bearing on the scope of recovery for a deductive change. In one case, the Department of the Interior Board held that the presence of a "VEQ" clause with a (+/-) 25% window did not preclude the contractor's recovery of an equitable adjustment under the "Changes" clause for unforeseen costs even though the additional quantities fell within the "VEQ" no-charge window. J.A. LaPorte, Inc., IBCA-1014-12-73, 75-
>
> 2 BCA ¶ 11,486, 17 GC ¶ 505; see also Morrison-Knudsen Co., IBCA-36 et al., 57-1 BCA ¶ 1264.
>
> In another case, the ENGBCA was presented with what the parties believed was a choice of applying a "VEQ" clause to either a 19% reduction in cement quantities, as argued by the contractor, or a 4% reduction, as argued by the Government. The board found that the parties had "Chosen the wrong battlefield" by confining their analysis to the "VEQ" clause. Rather, it held that the contractor was entitled to an equitable adjustment under the "Changes" clause. C.H. Leavell & Co., ENGBCA 3492, 75-2 BCA ¶ 11,596, 18 GC ¶ 43.

When the actual cost of unit price work differs greatly because of unforeseen factors, repricing is proper whether or not VEQ limits have been met. Further, the repricing may apply not only to the overrun underrun quantity, but may also include some or all of the original estimated quantity. See <u>Loftis v. United States</u>, 76 F. Supp. 616 (Ct. Cl, 1948); <u>Dunbar & Sullivan Dredging Co.</u>, ENG BCA 3165, 73-2 BCA ¶ 10,285.

In any event, whether adjustments are made via the differing site condition clause, the changes clause, or the VEQ clause, the abiding emphasis has always been on the modifier "equitable." By the literal terms of these contracts, if any adjustments are to be made then they must be "equitable." The Maryland Appellate Court's statement in <u>Genstar Stone Paving Products Co. v. State Highway Admin.</u>, 618 A.2d 256 (Md. App. 1993) typifies the philosophy of the various agency boards of contract appeals, the Court of Claims, State Appellate Courts, and the Federal Circuit:

> Apart from the determination of costs, additional leeway is implicit from the equitable nature of the adjustment and the fact that <u>it is merely to be based on and not necessarily equivalent to the cost differential.</u> Keeping a

> contractor whole does not require that it be given an excessive profit based on its use of creative accounting in devising its item bid; nor does it allow the Board to cause injury to the contractor by refusing to compensate it for unit costs legitimately incurred by reason of a significant change in the scope of the work upon which the contractor bid.
>
> The standard, being an equitable one, needs to be flexible in its application. It is not to be applied so rigidly as both the Board and the court, in their very different ways, applied it. (emphasis added)

Thus, we submit, there exist two separate and independent valid bases upon which the contract price may legitimately and properly be equitably adjusted, without which adjustment the compensation to this firm, viewed in context with the value delivered to the Government, would be the antithesis of "equitable."

As we earlier argued above, we respectfully submit that the differing site condition, or changes (or even constructive changes) clauses (only one of course) is most applicable here as opposed to an included-by-reformation VEQ clause.

The two major line items of compensation in this contract were excavation and transportation - indeed, loading the contaminated earth and transporting it to a safe, approved site was the only purpose of the contract. Additionally, this was the only contract this small 8(a) firm had at the time, and it was intended to carry <u>our entire</u> home office overhead and, hopefully, supply whatever profit there was to be made during that period. We spread our overhead (home office as well as field) over the estimated quantities (33%). But when suddenly the dirt was all gone, and we were far short of the estimate, we had failed to recoup the home office overhead intended and simply had to pack up and go home.

The shortfall in excavation was 1,407.27 cu. yds. At $49/yd, the "lost" compensation would have been $68,956.23 for the excavation. ENDE's unrecouped overhead on excavation computes to 33% of the above or $22,755.55. The shortfall on transportation is 3,161.08 cu. yds. at $125.50/yd., or $396,715.54. ENDE's unrecouped overhead for this element of work is 10% or $39,671.55, for a total unrecouped overhead of $62,427.10.

You already have the computational element of our early quasi-VEQ claim, so I won't repeat that here. I any case, as I said, we

truly feel the appropriate equitable adjustment is under the differing site conditions or changes clause. The fact situation is classic DSC. Everybody looked at the pile, the Corps surveyed it, and there was utterly no clue to anybody, until we actually came to the end of it, that the estimated quantity wasn't accurate.

A separate item that we didn't present to you in our first submission concerns a cost incurred by our rail car subcontractor, Greenfield Logistics, LLC. They rented rail cars in anticipation of the estimated quantity, and as a result have incurred a cost therefore in the sum of $38,940.00 for rail cars rented but sent back unused when the pile was exhausted.

If that firm has not presented this claim for equitable adjustment to you, please consider this on their behalf. If allowed, please then consider our claim for $6,619.80 for our allowed markup.

Once again, I thank you for the very professional and courteous treatment ENDE received in your administration of this contract.

Sincerely,

Engineered Demolition, Inc.

By: ______________________________
Anna Chong, President

AC/mjh

**ENGINEERED DEMOLITION, INC.**

3901 Schreiber Way
Coeur d'Alene, ID 83815

Phone: (208) 676-9900
Fax: (208) 676-9800

e-mail: implode@bigblast.com
website: www.bigblast.com

September 18, 2002

Brenda Wynne-George
Contracting Officer
U.S. Army Corps
8945 Latty Avenue
Berkley, MO 63134

RE: Contract No. DACW43-01-C-0426 (HISS IV)

Dear Ms. Wynne-George:

Following a phone conversation with Elizabeth Petrillo I checked the Contract language and found she was correct, that it did not contain a Constructive Changes clause (FAR 52.243-7), nor a DSC Clause (FAR 52.236-2).

In my request for reconsideration I mentioned the so-called Christian Doctrine only to distinguish it from my reliance upon the doctrine of Reformation of Contracts. Given the absence of the two Major Clauses I note above, I would supplement my presentation to you by arguing that the Christian Doctrine would have application to these two clauses as they are of such fundamental significance to any contract of this nature, notwithstanding counsel's assertion that they are only appropriate in construction contracts. Every demolition contract this company has with the USACE, for example, contains those clauses, and I'm sure that one would find countless instances in which they are incorporated into other than construction contracts exclusively.

Sincerely,

Craig C. Kosonen
General Counsel
ISB #939

CCK/mjh

ENGINEERED DEMOLITION, INC.

3901 Schreiber Way
Coeur d'Alene, ID 83815

Phone: (208) 676-9900
Fax: (208) 676-9800

e-mail: implode@bigblast.com
website: www.bigblast.com

September 25, 2002

Brenda Wynne-George
Contracting Officer
U.S. Army Corps
8945 Latty Avenue
Berkley, MO 63134

RE: Contract No. DACW43-01-C-0426 (HISS IV)

Dear Ms. Wynne-George:

This is in final supplementation of our letters of 10 February 2002 from Bill Welch, 24 July 2002 from Anna Chong, and 18 September 2002 from myself seeking an equitable adjustment in compensation regarding the above contract

My reference to the so-called Christian doctrine is, we feel, apt inasmuch as while Lambrecht & Sons, Inc., ASBCA 49 515, July 7, 1997, effectively rendered the doctrine unavailable for the importation of a missing VEQ clause because such a clause did meet the criterion of being a "mandatory" clause "that expresses a significant or deeply ingrained strand of public procurement policy," there is no question but that both the DSC and constructive changes clauses do and that they should be included "by operation of law" even if not physically present.

Finally, as to the law, we would urge you to consider our request under the additional theory of contract breach. The USACE bargained with claimant, succeeding in obtaining an agreement to transport a represented quantity of contaminated soil at a unit price that was figured to cover claimant's home office overhead spread out over the expected duration of load-out proportionate to that quantity. Had the true quantity been represented claimant would not have bargained for the pricing that resulted, and we would not have found ourselves a couple of days from completion with much unabsorbed home office overhead. Should it be suggested, by the way, that ENDE could have

protected itself by conducting its own survey, which the contract entitled us to do, it must be recognized that such would have accomplished nothing. The problem was not with the size of the pile, per se, but with the fact that it was not until the final week of the operation that the government decided that the final grade would be determined with respect to the elevation of the haul road, not the lower elevation represented by the bottom of the so-called "pond area," the result of in-hind-sight "over excavation" by ENDE during pursuance of the work under an earlier HISS contract, which excavation was at the express direction of the Corps' representative, Brenda Bienkowski.

The calculations and amount of our request were set forth in our 24 July letter and won't be revisited here; however, in that portion of that letter we said the pass-through claim on behalf of Greenfield Logistics had not been previously submitted. That was in error, of course, for it had.

Sincerely,

Craig Kosonen
General Counsel
ISB #939

CK/MJH