DEPARTMENT OF THE ARMY
ST. LOUIS DISTRICT, CORPS OF ENGINEERS
1222 SPRUCE STREET
ST. LOUIS, MISSOURI 63103-2833

REPLY TO
ATTENTION OF:

September 25, 2002

Contracting Division

SUBJECT: Final Contracting Officer's Determination
Contract No. DACW43-010C-0426
Main Pile Removal Action, Phase 2

Engineered Demolition, Inc.
Attn: Anna Chong, President
3901 Schreiber Way
Coeur d'Alene, Idaho 83815

Dear Ms. Chong:

I am writing in response to correspondence dated July 17, 2002 regarding your request on behalf of Engineered Demolition, Incorporated ("ENDE") for additional payment under Contract No. DACW43-010C-0426 (the "Contract"). This letter also serves as response to correspondence from your General Counsel, Mr. Craig Kosonen, dated September 18, 2002. The request is denied.

The St. Louis District entered into a supplies/services contract with ENDE for the removal, transportation and disposal of contaminated soils at the Hazelwood Interim Storage Site. There were only two variable quantity line items specified in the Contract, the main pile removal and the disposal-rail transportation of the contaminated soils. The unit prices stated in the contract for these two items were $49.00 and $125.50 per cubic yard respectively.

The terms of payment are clear on the face of the Contract. Both unit price payment items are covered by the following general clause:

> "Payment items for the work of this Contractor on which the contract unit price payments will be made are listed in the BIDDING SCHEDULE and described below. The unit price and payment made for each item listed shall constitute full compensation for furnishing all labor, materials and equipment, and performing any associated Contractor quality control, environmental protection, safety requirements, tests and reports, and for performing all work required for each of the unit price items."

Contract, §01025, ¶ 1.3. Further, payment for main pile removal is specified as:

> "The amount paid for will be the actual number of cubic yards of material, measured in its original position and removed from the pile, which is acceptably disposed of as herein specified . . . The unit of measurement for removal will be in-place cubic yards, computed by the difference in topographic surveys taken by the Government before and after the removal of the Main Pile."

Contract, §01025, ¶ 1.3.1. Payment for disposal-rail transportation is specified as:

> "Payment will be made for all costs associated with the transportation of waste. Disposal fees are not part of this contract. All work and costs involved with the transportation, by rail, to the disposal site are to be included in this item."

Contract, §01025, ¶ 1.3.2. There can be no mistake regarding the plain meaning of these contract terms. This is a service contract for removal, transportation and disposal of contaminated soils, and payment is made based on the quantities removed, transported and disposed. With the exception of lump sum items bid separately, the unit price is all-inclusive. No additional overhead, materials, profit or other consideration is contemplated or approved.

In your correspondence you cited two potential legal bases for relief. Your first basis involved utilizing the common law theory of reformation of contract to afford the inclusion of a variation in estimated quantities ("VEQ") clause. Your second basis necessitates the importation of a differing site conditions ("DSC") clause. The Contract contains neither a VEQ clause nor a DSC clause. I have discussed your contentions with my Office of Counsel, and will address each in turn.

We are in agreement that the Contract clearly has no VEQ clause. In fact, Page 1 of the "Bidding Schedule Notes" states:

> "All quantities shown on the SUPPLIES OR SERVICES AND PRICE/COSTS are estimated quantities except when the unit is shown as lump sum."

There was no misunderstanding or mutual mistake regarding the inclusion of a VEQ clause. The government did not include a VEQ clause and had no intention of including one. It appears your only support for the allegation of mistake was a statement made by Mr. Dave Mueller, the Contracting Officer's Representative ("COR"), during a preconstruction meeting for a *prior* contract in which he describes how final payment will be made. You state in your correspondence, and I agree, that Mr. Mueller as COR

has no authority to unilaterally add a VEQ clause to the contract. Addition of a VEQ clause would be a contract modification, and only contracting officers acting within the scope of their authority may execute contract modifications. FAR 43.102; *Hensel Phelps Constr. Co.*, GSBCA Nos. 14744, 14877, 01-1 BCA ¶31,249; *Daly Const., Inc.*, ASBCA No. 34322, 92-1 BCA 1 ¶24,469; *Commercial Contractors, Inc.*, ASBCA No. 30675, 88-3 BCA ¶20,877.

Additionally, Mr. Mueller's comments at the preconstruction meeting, when taken in context, support our contention that ENDE was fully aware of the payment process. Mr. Mueller outlined that progress payments for soils removed would be made, but final payment would be adjusted up or down based on survey data at the end of the contract. The estimated quantity was just that, an estimate, and variations were to be expected. Payments were to be based on the actual surveyed quantity of soil removed, transported and disposed. Finally, the comments you cite were made in regard to a different and wholly separate contract to the one at issue.

You also correctly state that the Christian Doctrine is inapplicable to this dispute. The Christian Doctrine stands for the proposition that clauses required by statute or regulation will be incorporated into a contract by operation of law. *G. L. Christian & Assoc. v. U. S.*, 312 F.2d 418, *cert. denied*, 375 U. S. 954 (1963). A VEQ clause is not required by statute or regulation, and is frequently omitted in a services contract of the type entered into with ENDE.

In short, a VEQ clause is not present in the contract, nor was one intended. There is no legal basis for me to import such a clause as a method to authorize additional payment to ENDE. In your correspondence to me, you also appear to have reached the same conclusion and discounted the merits of the VEQ argument by your statement " . . . we respectfully submit that the differing site condition, or changes (or even constructive changes) clauses (only one of course) is the most applicable here as opposed to an included-by reformation VEQ clause." ENDE Letter, July 7, 2002, p. 7.

Your second proposed legal basis hinges on implying the inclusion of a DSC clause where none is explicit in the Contract. Again, this proposal must be rejected. The DSC clause is included in some construction contracts to account for latent or subsurface conditions that differ materially from those indicated in the contract (*see Meredith Const. Co.*, ASBCA No. 40839, 93-1 BCA ¶25,399; *Caesar Constr., Inc.*, ASBCA No. 41059, 91-1 BCA ¶23,639) or when conditions encountered were unusual and unknown at the time of contracting (*see Walser v. U. S.*, 23 Cl. Ct. 591 (1991); *Gulf Coast Trailing Co.*, ENG BCA No. 5795, 94-2 BCA ¶26,921; *Soletanch Rodio Nicholson*, ENG BCA No. 5796, 94-1 BCA ¶ 26,472). Even if a DSC clause had been included in the Contract,

neither condition was met. There have been no allegations of a latent defect or unusual conditions. To the contrary, the pile to be removed was in clear view, was familiar to ENDE personnel, and consisted of materials as the government represented.

The Christian Doctrine is likewise inapplicable to the addition of a DSC clause. As stated *supra*, this doctrine only applies to clauses required by statute or regulation. A DSC clause does not fall into this classification, and, like the VEQ clause, is only rarely included in a services contract of the type entered into with ENDE.

To summarize, the Contract was a services contract for the removal, transport and disposal of contaminated soils. The variable quantities were clearly identified as estimates, and ENDE, through its past dealings with the Corps, knew or should have known exactly how payment was to be made. There is no ambiguity in the contract, no clauses were inadvertently omitted, and no clauses are required to be impliedly included. If there is no ambiguity within the four corners of a contract, extrinsic evidence is not to be considered. *C. Sanchez & Son, Inc. v. U. S.*, 24 Cl. Ct. 14 (1991), rev'd on other grounds, 6 F. 3d 1539 (Fed. Cir. 1993); *D & L Constr. Co.*, AGBCA No. 97-205-1, 00-1 BCA ¶31,001; *Skyline Technical Constr. Servs.*, ASBCA No. 51076, 98-2 BCA ¶29,888. Accordingly, ENDE's claim for additional consideration is denied.

This notice constitutes a final decision of the Contracting Officer. Decisions on disputes, questions of fact, and other questions are subject to the procedures of the Disputes Clause 52.233-1. If you wish to make such and appeal from this decision, written notice thereof (in triplicate) must be mailed or otherwise furnished to the Corps of Engineers, Board of Contract Appeals, 441 G Street NW, Washington, DC 20314, within 90 days from the date you receive this decision. A copy of any appeal shall be furnished to the Contracting Officer. Such notice should indicate that an appeal is intended and should reference the contract by number. The rules of the Corps of Engineers Board of Contract Appeals are docketed. In lieu of appealing to the Corps of Engineers Board of Contract Appeals, you may bring action directly to the U. S. Claims Court within 12 months of the date your receive this decision.

Please feel free to contact me at 314-331-8500, or Mr. Mark Wunsch or Ms. Beth Pitrolo of our Office of Counsel at 314-331-8191, if you have any additional comments or concerns.

Sincerely,

Brenda Wynne-George

BRENDA WYNNE-GEORGE
Contracting Officer

Copies Furnished:
Ms. Sharon Cotner, CEMVS-FUSRAP
Mr. Mark Wunsch, CEMVS-OC
Mr. Craig Kosonen, ENDE General Counsel

**DEPARTMENT OF THE ARMY**
ST. LOUIS DISTRICT, CORPS OF ENGINEERS
1222 SPRUCE STREET
ST. LOUIS, MISSOURI 63103-2833

REPLY TO
ATTENTION OF:

October 8, 2002

Contracting Division

SUBJECT: Response to Supplementation
Contract No. DACW43-010C-0426
Main Pile Removal Action, Phase 2

Engineered Demolition, Inc.
Attn: Craig Kosonen, General Counsel
3901 Schreiber Way
Coeur d'Alene, Idaho 83815

Dear Mr. Kosonen:

I am writing in response to correspondence dated September 25, 2002 in which you provided additional argument for an equitable adjustment in compensation on behalf of Engineered Demolition, Incorporated ("ENDE") under the above-referenced contract (the "Contract"). It appears that your letter was prepared prior to receipt of my correspondence of the same date. The Final Contracting Officer's Determination dated September 25, 2002 remains in full force and effect.

As previously stated, the Christian Doctrine is inapplicable to this dispute. The Christian Doctrine only applies to clauses required by statute or regulation. Neither a variation in estimated quantities clause nor a differing site conditions clause is required by statute or regulation. These clauses are, in fact, intentionally and routinely omitted from services contracts.

In addition, there was no breach of contract. No minimum quantity was stated or guaranteed. The specified volumes of soil to be removed, transported and disposed were clearly identified as estimates. The plain language of the Contract in this regard is clear.

Nothing in this correspondence alters the Final Determination of Contracting Officer previously forwarded to the President of ENDE. In addition, I also want to inform you again of a typographical error in that letter regarding the address for written notice of appeals. That address is the Corps of Engineers Board of Contract Appeals, 441 G Street, N.W., Washington, DC 20314. This information was provided to you by facsimile on October 2, 2002.

Please feel free to contact me at 314-331-8500, or Mr. Mark Wunsch or Ms. Beth Pitrolo of our Office of Counsel at 314-331-8191 if you have any additional comments or concerns.

Sincerely,

Brenda Wynne-George
/BRENDA WYNNE-GEORGE
Contracting Officer

Copies Furnished:
Ms. Sharon Cotner, CEMVS-FUSRAP
Mr. Mark Wunsch, CEMVS-OC

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGINEERED DEMOLITION, INC.,

Plaintiff,

vs. NO. 03-2231C

THE UNITED STATES,

Defendant.

DEPOSITION OF WILLIAM WELCH

Deposition upon oral examination of William Welch taken at the request of the Defendant, before Danelle Bungen, CSR, and Notary Public, at Engineered Demolition, 3901 Schreiber Way. Coeur d'Alene, Idaho, commencing at 9:00 a.m. on May 25, 2005.

John Williams.
Q. Okay. And does this reflect minutes or the description of a meeting between Engineered Demolition and the Corps of Engineers and anyone else?
MR. PERSON: If you know.
THE WITNESS: I'm sorry. What did John say?
Q. (BY MR. AVERBACH) "If you know."
MR. PERSON: I said "if you know," Mr. Welch.
THE WITNESS: This document, by matter of course, would represent notes taken by the Quality Control engineer in preparation or during the course of a preparatory inspection.
Q. (BY MR. AVERBACH) Were you a part of this preparatory inspection?
A. No, not that I'm aware of. I was on-site at different times, but I don't believe I was there for this one.
Q. Do you know whose handwriting is on this page?
A. No.
Q. It's not yours, is it?
A. No.
Q. On the second page, it says, "Discussed hole



created from the last phase. Hole must be filled in with material" -- it says "form," and I presume that means "from this site."
Do you have any recollection of having discussed the issue of filling in the hole on or about September 10th, 2001?
A. No.
Q. When was the first time that you became aware that the plan would be to fill the overexcavation -- the overexcavated portion of HISS II with materials from HISS IV?
A. Again, it's my recollection that the instructions from the government for us to fill it with material off of the site, contaminated material off of the site, came later towards the end of the contract. There may have been discussions about that possibility prior to then, but formal instructions from the government did not come until later in the contract.
Q. Okay. Sir, I'm going to ask the court reporter to mark as Exhibit 4 a letter dated October 1st, 2001, bearing your signature.
(Exhibit No. 4 - Letter dated 10-1-01 - marked for identification.)



Q. (BY MR. AVERBACH) Please take a moment to -- I'm sorry, not bearing your signature; bearing Mr. Miller's signature.
MR. PERSON: I'm sorry. What's the date of that, Andrew?
MR. AVERBACH: October 1st, 2001.
MR. PERSON: Okay. I've got it.
THE WITNESS: This confirms what I just told you; there were discussions prior to but official word did not come until the first part of October.
Q. (BY MR. AVERBACH) Okay. Let's get to that result. I just want to see how we get there first. Did you receive this letter on or about October 1st, 2001, or do you have a recollection of receiving it then?
A. Yes, I have some recollection of it. That's why I told you just previously that official word from the government that this is what we were to do didn't come until that period of time.
Q. And the attachment to the letter, have you seen those -- have you seen the attachment to the letter previously?
A. Yes.
Q. And does that attachment reflect the contents of a



coordination meeting held on September 27th, 2001?
A. Yes.
Q. And I take it that the relevant portion of this document relating to the overexcavation issue was on the first page under the heading 2-B? The first page of the memo, not the --
A. That's correct.
Q. And it says, "Per previous discussion, the low area caused by overexcavation on the previous contract would be filled using material from the pile."
Do you have a recollection of that being discussed at this coordination meeting?
A. I have no specific recollection of it being discussed at the coordination meeting, but this obviously speaks better than my memory.
Q. You don't have any reason to doubt this was discussed --
A. No.
Q. -- at that meeting.
And it says "Per previous discussion." Do you have any understanding what the previous discussion was concerning that issue?
A. There were multiple discussions with regard to that issue, and one that comes to mind more than

Page 34

anything else, that weighed more against this decision right here (indicating), was the comments on several occasions, both one on one with myself and David Mueller, and at times when there were many people at the meeting, where his statement was, "We need to take out all the material we can on this contract, contaminated material."

Now, when we refer that to the discussions that culminated into this decision right here (indicating), it was our proposal at the time that we fill that hole with the same material that we were bringing back in on top of all of the rest of the area that was -- that the excavation was complete on, which was a -- a gravelly rock material that we would bring in for a final grade. And reasonably so, we expected that, "Okay. We're going to fill this hole. We'll bring that material back in to fill the hole with as well."

Q. Did you understand that EnDe would be responsible for the cost for bringing in some external material to fill in that hole?

A. I understood that the discussions with the government were, on the government's part, that EnDe would be responsible for that. I have

Page 35

some -- some misgivings about it because that occurred on a previous contract and, from the best of my understanding, was directed by the government themselves for that hole to be dug. But I did not know all the facts of it.

I knew that the government's position, by the time we got into Contract IV, was that, "EnDe, you dug the hole. EnDe, you're going to fill the hole." But I did not have enough facts then, and I do not have enough facts now, to argue that that was contractually wrong. I believed it was wrong, but then, again, I did not have all the facts.

Q. Do you have any understanding as to how much it would have cost to bring in the type of external materials you're talking about to fill in the overexcavated portion of HISS II?

A. I could certainly run a best-guess calculation. I would imagine it would cost around $20 a cubic yard to bring it in; or maybe even, at the price of labor there, maybe as much as 30 or $35 a cubic yard to bring in outside material and fill the hole. But, again, without sitting down and doing an actual calculation, those are just best guess.

Q. Okay. With respect to this 762 cubic yards that

Page 36

were used to fill up the overexcavated portion on HISS II, was EnDe compensated on HISS IV to excavate those 762 cubic yards?

A. Yes.

Q. Okay.

A. We were compensated to excavate those from the pile --

Q. Right.

A. -- that was to be -- what we thought was to be removed from the site.

Q. Okay. I take it you've seen a copy of -- well, you've obviously seen a copy of the interrogatories before, of EnDe's responses to the interrogatories; is that correct?

A. I've -- I've seen the interrogatories that were generated, yes.

Q. Well, let me not focus on the interrogatories. There's no reason to do that here.

Do you understand that Engineered Demolition -- part of Engineered Demolition's claim as it currently stands right now is that there was a deficiency in the amount of -- the amount of material to be both excavated and transported due to one of two reasons; either, No. 1, a negligent estimate, or, No. 2, the

Page 37

directive by the government to fill in overexcavated depressions from previous contracts.

A. Yes.

Q. With respect to that second portion of the claim, meaning the directive by the government to fill in overexcavated material, would you agree with me that the 762 yards, cubic yards, that EnDe received compensation for the 762 cubic yards with respect to excavating it, and that the issue with respect to those 762 yards would be solely with respect to transporting it? Is that a fair characterization?

A. EnDe received compensation for excavating that material and did not receive compensation for transporting the material.

Q. Okay. Let's get a little more general here again. Can you explain to me in layman's terms how the process works for -- or how the process was to work under HISS IV to, No. 1, excavate the material and, No. 2, transport it to Utah?

A. The process worked the same on HISS IV as it did on HISS III and I'm assuming did on HISS I and II. It's not a complicated process, but it was a very methodical, same thing each day. The pile would be covered at the end of a given day so that the

Page 62

Q. Let me ask my question a little bit differently then. Did C-3, did the drawing C-3, represent, to your understanding, the amount -- or did it depict the amount that the Corps of Engineers was asking bidders to dig down to?
A. No.
Q. Why not?
A. Because there's an error on this drawing.
Q. And what is that error?
A. That error is where they depict this as 6600 cubic yards to be removed and the contract bid schedule identifies it as, I believe, 8800 cubic yards to be removed. And when that discussion was brought up about the error, that opened up again the comments from Mr. Mueller that, "We're going to remove everything we can under this contract. We have enough money to remove 8800 cubic yards. We're going to remove 8800 cubic yards."
Q. Sir, was the error -- Let me make sure I'm clear with you. Each of these cross sections depict -- each of cross sections have a horizontal line, or roughly horizontal line, going across them. Is that fair to say?
A. Each of these drawings have a line that identifies a -- not horizontal, but slightly less than

Page 63

horizontal line with a slope going down to the drainage ditch --
Q. Right.
A. -- and showing the pile portion to be removed on top of that.
Q. And that line is at or about -- I presume it's 520 feet above sea level?
A. Yes.
Q. Is the error that you just referred to an error in calculating the shaded area or an error in setting the appropriate point for the near-horizontal line?
A. The error that stands out is the error that identifies 6600 cubic yards to be removed when the bid schedule itself says 8800 cubic yards to be removed.
Q. When did you realize that the -- that drawing C-3 contained the error to which you're referring?
A. Prior to negotiation of the contract.
Q. And did you notice that upon your review of the drawings?
A. Yes.
Q. And what did you do once you noticed that?
A. Talked to Mr. Mueller about it, and, again, that inspired the conversation where we told us, "We

Page 64

have X amount of dollars. We intend to spend it. We need to remove everything we can under this contract."
Q. Do you recall the particular date or time of that conversation?
A. That conversation took place on several different occasions.
Q. Did he tell you to disregard the 6600 estimate?
A. I do not recall him saying specifically, "Disregard it," but his comments certainly gave us every reason to believe that the 8800 cubic yard amount was correct and not the 6600 cubic yard amount.
Q. Did you believe that the 8800 cubic yard amount was correct because you were actually going to be digging below the lines set forth on C-3 or because the shaded area was closer to 8800?
A. I need to answer that with a little bit of a better understanding about what we were paid to do. The government surveyed these sites. On more than one occasion, I asked Mr. Mueller, "Should we be surveying these sites, too, or can we go off of your survey marks?" And, in fact, this played into part of the negotiation of HISS IV.
We didn't have money in there to survey,

Page 65

he thought there was absolutely no need for us to do any surveying, the government was going to survey, the government was going to establish grades. The government established grades in their surveys that gave them the information to put together these documents.
In the multiple conversations that I had with Mr. Mueller through the completion of HISS III leading into HISS IV, we had every reason to expect that not only we don't need to have money in there for surveying, but we can feel comfortable about the government's surveys and we can expect the government to provide accurate survey information for us to utilize during the course of our contract.
Q. Did Mr. Mueller ever say to you -- instruct you not to perform a survey?
A. Mr. Mueller told me that -- in his words, this I do recall, in his words, "You're wasting your money if you perform a survey because we're doing it for you."
Q. Did you understand that Engineered Demolition still had the right to conduct a survey?
A. Absolutely.
Q. And you mentioned at the beginning of the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGINEERED DEMOLITION, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-2231C<br>(Judge Lettow) |

**DECLARATION OF DAVID E. MUELLER**

1. I am employed by the U. S. Army Corps of Engineers, St. Louis District (the "Corps") as a civil engineer at the Formerly Utilized Sites Remedial Action Program ("FUSRAP") site.

2. I was actively involved in the contract negotiation, management, and execution for the removal of contaminated soil at the Hazelwood Interim Storage Site ("HISS") located in north St. Louis County, Missouri. I served as the Contracting Officer's Representative on four contracts between the Corps and Engineered Demolition, Incorporated ("ENDE"), which ultimately resulted in the full removal, transportation and disposal of contaminated soil at HISS. Those contracts were as follows:

a. DACW43-99-C-0426 (HISS 1);

b. DACW43-00-C-0430 (HISS 2 and 2M);

c. DACW 43-01-C-0404 (HISS 3); and

d. DACW 43-01-C-0426 (HISS 4, also known as "Main Pile").

3. In my duties as Contracting Officer's Representative, it was my responsibility to ensure that ENDE's work was completed in accordance with the relevant contract and the work plans. I approved all work plans. I also visited the site regularly; at least once a week while work was in progress on each contract.

4. During the execution of the HISS 2 and 2M contract, ENDE over-excavated and removed more soil than indicated by the final approved grade elevation, creating a depression in which water was impounded. This was not done at the direction of any Corps employee with the authority to direct such a change. That authority rested only with me in my capacity as Contracting Officer's Representative, or in the Contracting Officer. The Contracting Officer was Ms. Brenda Wynne-George.

5. ENDE was aware of this error in over-excavation, and was also aware that ENDE would be required to correct the error and bring the topography to the final finished elevation mandated by the HISS 2 and 2M contract's plans and specifications.

6. The Corps paid ENDE for the removal of the over-excavated material under the HISS 2 and 2M contract.

7. ENDE was required in all four HISS contracts to provide dust control for its operations, which ENDE did through the use of water sprays. In light of the fact that ENDE had requested to use the water that collected in the over-excavated area for the purposes of dust control, I allowed ENDE to delay filling the depression until the entire pile was removed. The use of the depression for water collection resulted in a cost savings to ENDE, as it did not have to procure or purchase water from an alternative source.

8. Per the contract, the over-excavated area was required to be finished to an approved cross section by using existing material from the site. ENDE used 762 cubic yards soil

excavated under the HISS 4 contract for this purpose. This request originated with ENDE's site representative, Mr. William Welch, and was approved by me. The filling of the over-excavation was performed in accordance with the Grading clause of the HISS 2 and 2M contract.

9. ENDE was fully paid for the excavation of the 762 cubic yards of soil at a unit price of $49.00 per cubic yard, as per the terms of the HISS 4 contract. ENDE was not paid for disposal and rail transportation of the 762 cubic yards of soil, for the mere fact that the soil was neither transported off-site, nor disposed of in a facility licensed to accept contaminated waste. In other words, ENDE was only paid for the work it actually performed. In the end, ENDE was paid for the excavation of 6677 cubic yards of soil and the disposal of 7,338.72 cubic yards of soil.

10. ENDE never submitted a claim for an equitable adjustment to me or to the Contracting Officer based upon the theory that the deposit of material from the HISS 4 contract into the over-excavated area constituted a "change." As described above, the "change" was one that ENDE proposed and that I approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2005.

David E. Mueller

DAVID E. MUELLER