# In the United States Court of Federal Claims

No. 03-2231C

(Filed: March 28, 2006)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | ) | Breach of contract for removal |
| | ) | of radiologically contaminated |
| ENGINEERED DEMOLITION, INC., | ) | soil; motion for partial dismissal; |
| | ) | subject matter jurisdiction; |
| Plaintiff, | ) | motion for summary judgment; |
| v. | ) | Contract Disputes Act; Changes |
| | ) | Clause in FAR [48 C.F.R. §] |
| UNITED STATES, | ) | 52.243-1; equitable adjustment |
| | ) | |
| Defendant. | ) | |
| | ) | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

John C. Person, Person & Craver LLP, Washington, D.C., for plaintiff.

Andrew P. Averbach, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch. Of counsel was Beth Pitrolo, United States Army Corps of Engineers, St. Louis, MO.

## OPINION AND ORDER

LETTOW, Judge.

In this contract dispute, the government has moved for partial dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") and for summary judgment. Plaintiff, Engineered Demolition, Inc. ("Engineered Demolition"), seeks to recover $107,987 in additional costs, plus interest, allegedly incurred in completing a contract entered with the United States Army Corps of Engineers ("Corps" or "Corps of Engineers") for the "removal, transportation, and disposal of radiologically contaminated material" located at the Hazelwood Interim Storage Site ("HISS") in St. Louis County, Missouri. *See* Contract Documents Filed Pursuant to Court's Order Dated February 3, 2006 ("Supp. Materials") at 234 (Contract Section C: Summary of Work ¶¶ 1.1, 1.2.1).

Engineered Demolition claims $69,047 in under-absorbed overhead costs due to a shortfall in the amount of radioactive material that it excavated and transported from HISS. Engineered Demolition also sponsors the claim of its subcontractor, Greenfield Logistics, LLC ("Greenfield"), for $38,940 in damages that Greenfield allegedly incurred through leasing gondola rail cars that were not used due to the shortfall in material.

This is the second time that the government has moved to dismiss Engineered Demolition's complaint. After the complaint was filed on September 26, 2003, the government submitted a motion to dismiss for lack of subject matter jurisdiction, contending that Engineered Demolition had failed to satisfy the certification requirement set out in Section 6(c) of the Contract Disputes Act ("CDA"), 41 U.S.C. § 605(c), applicable to claims that exceed $100,000. *See Engineered Demolition, Inc. v. United States*, 60 Fed. Cl. 822 (2004). The court denied the government's motion, holding that Engineered Demolition's and Greenfield's claims were "separate and independent in nature" and thus the certification requirement was inapplicable because neither claim was above $100,000. *Id*. at 831.

Ordinarily, the court would not entertain a second round of potentially dispositive motions. However, this second set of motions turns in large part on information developed as a result of discovery and preparation for trial, and consequently the pending motions are not merely a reprise of or derivative from the earlier motion.

The parties have fully briefed their positions and a hearing on the government's motions was held February 3, 2006. For the reasons stated below, the government's motion for partial dismissal is denied and its motion for summary judgment is granted in part and denied in part.

## BACKGROUND[1]

On July 24, 2001, the Corps of Engineers issued Solicitation No. DACW43-01-R-0702 seeking bids for the "removal, transportation, and disposal of radiologically contaminated material located in the Main Pile, and engineering controls to control offsite spread of contamination from the HISS site." Supp. Materials at 1 (Solicitation), 234 (Contract Section C: Summary of Work ¶ 1.2.1). Engineered Demolition submitted its offer on August 9, 2001, *id*. at 228, and ultimately the Corps entered into a firm-fixed-price contract with Engineered Demolition on August 31, 2001 for a contract price of $2,301,894.67. *Id*. at 227 (Contract No. DACW43-01-C-0426, signature page); Compl. ¶¶ 7-8. The period for performance on this contract was fixed at 90 days. Compl. ¶ 10. This contract was the final installment of four such contracts between the Corps and Engineered Demolition for the complete removal, transportation, and disposal of radiologically contaminated material at HISS. *Id*. ¶ 7; Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts ("Pl.'s Response to Def.'s

[1]The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for purposes of the pending motion.

Facts") ¶ 3; Defendant's Motion for Summary Judgment ("Def.'s Mot.") Appendix ("App.") at 74 (Declaration of David E. Mueller, Authorized Representative of the Contracting Officer (Sept. 15, 2005)) ¶ 2. This fourth and final contract was denominated as "HISS 4." *See* Def.'s Mot. App. at 74 ¶ 2.

Engineered Demolition was responsible for removing the main pile of contaminated material in accord with the specifications in the contract. Supp. Materials at 335 (Contract Section C: Soil Removal ¶ 3.1). These specifications were set out in contract drawings that the government provided to potential offerors as part of the solicitation and which thereafter were incorporated into the contract. Those drawings included the existing site plan, a final site plan, and cross sections of the portion of the site to be excavated. *Id*. at 357-58 (Contract Section H: Special Contract Requirements), 451-56 (Contract Drawings). The areas of the pile designated for excavation were to be removed "true-to-grade" such that the "[s]urface [of the area on which the pile was located would] be finished not more than 0.10 feet above or below the established grade or approved cross-section." *Id*. at 336 (Contract Section C: Soil Removal ¶ 3.4). The contract also mandated, upon the work's completion, that the contractor restore the designated mobilization and work area to its condition as it existed prior to the commencement of the project. *Id*. at 312 (Contract Section C: Temporary Construction Activities ¶ 1.11), 333 (Contract Section C: Soil Removal ¶ 1.2).

Payment under the contract was to proceed on a specified schedule. Supp. Materials at 229 (Contract Section B: Bidding Schedule), 236-37 (Contract Section C: Measure and Payment ¶¶ 1.2, 1.3). For the seven items of work listed in the schedule, the contractor would be paid either by lump-sum payments or unit-price payments. *Id*. at 236-37. The lump-sum prices proposed by Engineered Demolition and accepted by the Corps for five of the seven work items "constitute[d] full compensation for furnishing all plant, labor and materials" for those services. *Id*. at 236 ¶ 1.2. For example, site restoration, work number 0020, was paid by lump sum and included the "installation of (new) separation/filtration geotextile material, the importation and placement of clean topsoil, fine grading, and revegetation." *Id*. at 231 (Contract Section B: Bidding Schedule Notes ¶ 8). With respect to items covered by the other payment mode, unit-price payments, offerors proposed a unit price and a total dollar amount based on quantities furnished by the Corps for each of the two work items to be compensated in this fashion: Main Pile Removal and Disposal - Rail Transportation. *See* Pl.'s Response to Def.'s Facts ¶ 4; *see also* Supp. Materials at 237 ¶ 1.3 (stating that "[t]he unit price and payment made for each item listed [would] constitute full compensation for furnishing all labor, materials, and equipment" for those services). The pile-removal item included all work to remove the main pile of contaminated waste material and load it onto rail cars for transport and disposal. *Id*. at 231 (Contract Section B: Bidding Schedule Notes ¶ 6). The rail-transportation item encompassed the transportation by rail to a third-party commercial facility in Utah of all the material that had been excavated from the main pile. *Id*. at 231 (Contract Section B: Bidding Schedule Notes ¶ 7), 336 (Contract Section C: Soil Removal ¶ 3.3); *see also id*. at 321 (Contract Section C: Transportation of Hazardous Materials Requirements § 02120). Pursuant to the contract, "*[a]ll* material removed from the waste piles [would] be disposed of" in accordance with the contractual

provisions concerning transportation and disposal of hazardous materials. *Id*. at 336 (Contract Section C: Soil Removal ¶ 3.3) (emphasis added).

Both the solicitation and the contract stated that the quantities listed in the bidding schedule for Main Pile Removal and Disposal were "estimated quantities." Supp. Materials at 3 (Solicitation Section B: Bidding Schedule Notes ¶ 1), 230 (Contract Section B: Bidding Schedule Notes ¶ 1). Final figures would be computed according to surveys conducted by the government to determine the quantity of work performed. *Id*. at 237 (Contract Section C: Measurement and Payment ¶ 1.3.1(b)), 356 (Contract Section H: Special Contract Requirements, incorporating FAR 52.236-16(a) (Quantity Surveys)). Ultimately, the contractor was to be paid for the removal of material from the main pile according to "the actual number of cubic yards of material, measured in its original position and removed from the pile, which is acceptably disposed of." Supp. Materials at 237 (Contract Section C: Measurement and Payment ¶ 1.3.1(a)); *accord id*. at 335 (Contract Section C: Soil Removal ¶ 3.1.2); *see* Plaintiff's Opposition to Defendant's Motion for Partial Dismissal for Lack of Subject Matter Jurisdiction and for Summary Judgment ("Pl.'s Opp.") Appendix ("App.") at 1 (Preparatory Inspection Notes (Sept. 10, 2001)) ("Government survey dictates payment as per the contract."). Payment for disposal by rail would be based on the government's measurement of ex-situ material *actually* placed in each rail car, *i.e.*, material as it had expanded due to the excavation operation, and include "all costs associated with the transportation of the waste." Supp. Materials at 237 (Contract Section C: Measurement and Payment ¶ 1.3.2).[2]

In the solicitation's bidding schedule, the Corps had projected that 8,080 cubic yards of material would be removed from the main pile, and consequently, that 10,500 cubic yards would be disposed of and transported by rail. Supp. Materials at 2 (Solicitation Section B: Bidding Schedule). Engineered Demolition's successful bid on the contract, $2,301,894.67 for the entire project, included unit prices of $49 per cubic yard for removing the projected 8,080 cubic yards of material from the main pile and $125.50 per cubic yard for transporting and disposing the uncompacted material. *Id*. at 229 (Contract Section B: Bidding Schedule).

Prior to submitting its bid for the contract, Engineered Demolition discovered that an inconsistency existed in the solicitation regarding the amount of material to be removed; the bidding schedule and the contract drawings showed different amounts. Def.'s Mot. App. at 73 (Deposition of William Welch, Vice-President Chief of Operations and Project Manager, Engineered Demolition (May 25, 2005)) at 62:1 to 63:22. The bidding schedule indicated that 8,080 cubic yards were to be excavated, but a contract drawing that detailed five cross sections of the main pile denoted that the total excavation would equal approximately 6,600 cubic yards. *Compare* Supp. Materials at 2 (Solicitation Section B: Bidding Schedule), *with id*. at 455

[2]Excavation of the material would cause the quantity to expand from the relatively compacted state in which it existed in the main pile. Compl. ¶ 9; Def.'s Mot. at 4 n.1.

(Drawing Number C-3).[3] In accord with the solicitation's provisions, *see id*. at 130 (Solicitation Section H: Special Contract Requirements) (FAR 252.230-7001(b)(3), (4)), 224 (Solicitation Section L: Clarification of Requirement), Engineered Demolition alleges that it asked the government to resolve this discrepancy and that the Corps responded that it had the available funds to remove over 8,000 cubic yards of material and intended to do so. Def.'s Mot. App. at 73 (Dep. of Welch) at 63:23 to 64:3.

The quantity to be removed affected the resources that would be needed for the work. Engineered Demolition asserts that during contract negotiations, which took place on August 16-17, 2001, the Corps agreed with Engineered Demolition's determination that 125 rail cars would be required to dispose of and transport the estimated 10,500 cubic yards of excavated material. Compl. ¶ 11. Thereafter, Engineered Demolition entered into a subcontract with Greenfield on September 24, 2001 to transport that amount of radioactive material from HISS to a third-party facility in Utah, and Greenfield then ordered 125 rail cars. *Id*. ¶ 13.

The government gave notice to Engineered Demolition that it could proceed with its performance under the contract in early September 2001, Def.'s Mot. App. at 44 (Letter from Brenda Wynne-George, Contracting Officer, Corps of Engineers, to Anna J. Chong, President, Engineered Demolition (Sept. 6, 2001)), and three weeks later the parties held a meeting on September 27, 2001 to coordinate various aspects of the project. *Id*. at 46-48 (Memorandum of Record (Sept. 27, 2001)). According to a memorandum that summarized the results of that meeting, one item addressed by the parties was whether Engineered Demolition should fill a depression which had been caused by over excavation under a previous HISS contract. *See* Pl.'s Opp. App. at 2 ("Discussed hole created from last phase. Hole must be filled in with material from this site."); *see also* Def.'s Mot. App. at 75-76 (Declaration of Mueller) ¶¶ 4-8. The Corps' representatives indicated that Engineered Demolition should fill the depression with a portion of the material excavated from the main pile. *Id*. at 46 ¶ 2.B. Thereafter, this memorandum was distributed to Engineered Demolition for review and comments. *Id*. at 45 (Letter from Mueller to Welch (Oct. 1, 2001)). Subsequently, Engineered Demolition placed 762 cubic yards of material excavated from the main pile as fill in the depression. Pl.'s Response to Def.'s Facts ¶ 19.[4]

---

[3]The figure shown on the drawing had been calculated by the Corps according to "computer models based on survey data for the existing grade [of the pile] and engineering judgment for the location of [the] original ground line." Supp. Materials at 455 (Drawing Number C-3 note 1).

[4]Engineered Demolition was paid in accordance with the contract for excavating this material but not for transporting it. Pl.'s Response to Def.'s Facts ¶ 19.

Subsequently, six modifications were made to the contract, only one of which is material to this case.[5] The contested modification adjusted the quantities of material handled under the contract. Def.'s Mot. App. at 41-43 (Modification No. P00006 (Jul. 9, 2002)). During its performance, Engineered Demolition had become aware that the quantity of material that it was excavating from the main pile was less than the amount listed in the contract's bidding schedule. Def.'s Mot. App. at 49-50 (Letter from Welch to Mueller (Feb. 10, 2002)). In October 2001, Engineered Demolition alleges that the Contracting Officer's Representative "decided that the final elevation for the finish grade would be [modified and thereafter] based on the elevation of the haul road." Compl. ¶ 14. As Engineered Demolition would have it, this change in elevation for the finish grade was the cause of the decrease in the total quantity of material excavated. *Id.* ¶ 16; *see* Supp. Materials at 409 (Contract Section I: Contract Clauses) (FAR 52.243-1(a)).

In all events, in February 2002, Engineered Demolition sought an equitable adjustment for "unabsorbed overhead, direct costs and profit loss," which included the unused overhead on the contract, 30 unused rail cars, 10 working days that were never required, and the cost for returning the rail cars, equaling $161,729.16. Def.'s Mot. App. at 50. Engineered Demolition asserted that had it known, during contract negotiations, that the actual quantity of material that it would need to remove and transport would have been significantly less than the Corps projected, it would have adjusted its unit prices and other costs. *Id.* at 49. The Corps rejected this request for an equitable adjustment on the grounds that the contract had not included a "Variation in Estimated Quantities" clause and that the Corps could find no other mechanism in the Federal Acquisition Regulations ("FAR") that would obligate the Corps to compensate Engineered Demolition for the shortfall. *Id.* at 51 (Letter from Mueller to Welch (Apr. 18, 2002)). Engineered Demolition sought a reconsideration of this decision with the Contracting Officer. *Id.* at 52-59 (Letter from Chong to Wynne-George (July 17, 2002)).

Promptly thereafter, notwithstanding the fact that performance of the contract was complete, the Corps acted to modify the contract to decrease the quantities listed in the contract's

---

[5]Three modifications were ministerial. Modification Numbers P00001 and P00002 authorized an increase in funds available for payment. Supp. Materials at 449-50 (Modification No. P00001 (Sept. 14, 2001) and Modification No. P00002 (Oct. 5, 2001)). Modification Number P00005 amended the contractor's address. *Id.* at 444 (Modification No. P00005 (Jan. 15, 2002)).

Two additional modifications were not controversial. One of these modifications provided an extension of the contract completion date with an attendant increase to the contract price for the ensuing delay, Supp. Materials at 447-48 (Modification No. P00003 (Dec. 18, 2001)), and a second modification decreased the total contract price due to the elimination of a site-restoration requirement. *Id.* at 445-46 (Modification No. P00004 (Jan. 14, 2002)); *see* Pl.'s Opp. App. at 5 (Memorandum of Record (Sept. 27, 2001)) ¶ 2.E (noting that Mueller informed Engineered Demolition that the government might eliminate the obligation to spread two topsoil stockpiles).

bidding schedule to reflect the actual amount of material that had been excavated and transported. Def.'s Mot. App. at 41-43 (Modification No. P00006 (July 25, 2002)). The quantity of material removed from the main pile was reduced from 8,080 to 6,677 cubic yards and the amount of material transported and disposed was amended from 10,500 to 7,338.72 cubic yards. *Id*. at 43. The new figures were "computed from field surveys." *Id*. The contract price was decreased from $2,332,044.67 to $1,866,557.03. *Id*. The Corps made the modification pursuant to FAR 52.234-1, the Changes Clause incorporated in the contract. *Id*. Engineered Demolition acknowledged receipt of the modification but did not accept it and instead "reserve[d] all rights to seek equitable adjustment" and contest the final quantity figures. *Id*. at 41.[6]

After this modification was entered by the Corps, Engineered Demolition renewed its request for reconsideration of the Contracting Officer's denial of an equitable adjustment. *See* Def.'s Mot. App. at 60 (Letter from Craig C. Kosonen, General Counsel, Engineered Demolition, to Wynne-George (Sept. 18, 2002)); *id*. at 61-62 (Letter from Kosonen to Wynne-George (Sept. 25, 2002)), but the Contracting Officer denied this request in a final decision. *Id*. at 63-67 (Contracting Officer's Final Decision (Sept. 25, 2002)), 68-69 (Letter from Wynne-George to Kosonen (Oct. 8, 2002)) (responding to Kosonen's letter, dated September 25, 2002, and reaffirming the final decision).

## STANDARDS FOR DECISION

As a threshold matter, the jurisdiction of a federal court must be established before the court may entertain the merits of an action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). A plaintiff has the burden of establishing the court's subject matter jurisdiction over its claims. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When deciding whether it possesses jurisdiction over a case, the court must "draw all reasonable inferences in favor of the plaintiff" and accept the facts as they are presented in the plaintiff's complaint as true. *Goel v. United States*, 62 Fed. Cl. 804, 806 (2004) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)); *see also Hamlet v. United States*, 873 F.2d 1414, 1415-16 (Fed. Cir. 1989). If the undisputed facts in the complaint reveal any possible basis on which the plaintiff might prevail, the court must deny the motion to dismiss. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).

Summary judgment may be granted "if . . . [the record] show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The

---

[6]Separately from its request for equitable adjustment due to the shortfall, Engineered Demolition contended that it had actually removed 73 cubic yards from the main pile that had not been credited by the Corps and it had transported by rail 0.20 cubic yards more than the Corps had acknowledged. Def.'s Mot. App. at 41.

burden of establishing that no genuine issue of material fact exists rests with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). A dispute is considered to be "genuine" if it "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. If a fact "might affect the outcome of the suit under the governing law," it will be deemed "material." *Id*. at 248. When deciding a motion on summary judgment, the court must resolve all inferences "'in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). No genuine issue of material fact exists if a rational finder could reach only one reasonable conclusion. *See, e.g., Matsushita*, 475 U.S. at 587.

## ANALYSIS

All of the competing contentions in this case revolve around the shortfall in material that was excavated and transported. Engineered Demolition pleads several variations on the constructive-change doctrine and on the Changes Clause in the contract to put forward its claims and those of Greenfield for equitable adjustment of the amount due under the contract. Engineered Demolition's claim for breach of contract also focuses on the government's projection of the quantities of material to be excavated and transported for disposal. The government relies on exhaustion and related doctrines to preclude or curtail these claims. Where the government's defenses have a jurisdictional aspect, this analysis will address those defenses before considering Engineered Demolition's underlying claims.

### A. Claims for Equitable Adjustment

Engineered Demolition states three equitable adjustment claims, one on the basis that there was no Changes Clause in the contract and thus that the constructive-change doctrine applies, and the other two on the ground that a changes clause applies to provide grounds for relief. The first such claim is concededly invalid. The contract incorporates the Changes Clause from the FAR. Pl.'s Opp. at 7. Consequently, the court grants the government's motion for summary judgment with respect to count one of the complaint.

Engineered Demolition also concedes that the second and third counts of its complaint should be merged to state a single cause of action based upon the Changes Clause of the contract. The government resists the merged claim for relief on two grounds: first, that Engineered Demolition did not properly present its claim based on the Changes Clause to the Contracting Officer, and second, that Engineering Demolition either accepted the change or voluntarily performed in accord with the change.

#### 1. *Presentation of the claim to the Contracting Officer.*

Pursuant to the CDA, this court has subject matter jurisdiction over a claim that has been presented to a contracting officer if the contracting officer has entered a final decision denying the claim or the contracting officer has failed to render a decision on a claim in a timely manner

and the claim is "deemed" denied. *See James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996); *Case, Inc. v. United States*, 88 F.3d 1004, 1008-09 (Fed. Cir. 1996). Because the CDA does not define the term "claim," courts should look to the FAR, which implements the CDA, in determining whether a contractor has made a claim to the contracting officer that serves as a predicate for this court's consequent consideration of the claim. *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc).[7]

FAR 52.233-1, which was incorporated into the contract at issue, defines a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." FAR 52.233-1(c); *accord* Supp. Materials at 406 (Contract Section I: Contract Clauses). *Reflectone* holds that a request for an equitable adjustment is a claim according to the FAR, and thus a claim under the CDA. 60 F.3d at 1575-77; *accord James M. Ellett*, 93 F.3d at 1542.[8]

Importantly, there is no requirement under the CDA that a contractor must use a particular form or wording to state a proper claim. *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Id.* (citing *Tecom, Inc. v. United States*, 732 F.2d 935, 936-37 (Fed. Cir. 1984); *Metric Constr. Co. v. United States*, 1 Cl. Ct. 383, 392 (1983)).

In its claim to the Contracting Officer, Engineered Demolition sought an equitable adjustment because of a quantity shortfall in the amount of material that it excavated from the main pile at HISS and transported to a third-party facility. Def.'s Mot. App. at 52, 58-59 (Letter from Chong to Wynne-George (July 17, 2002)). Engineered Demolition explained that its request was supported by a Changes Clause and other clauses that were or should be deemed to be incorporated in the contract. *See id.* at 54 (Letter from Chong to Wynne-George (July 17, 2002)), 60 (Letter from Kosonen to Wynne-George (Sept. 18, 2002)). Engineered Demolition sought a sum certain, $107,986.90, as recompense for unabsorbed overhead for itself and its subcontractor. *Id.* at 58-59.

---

[7]"In addition to the 'submission' of a claim, the CDA requires that the claim itself meet basic procedural requirements: it must be in writing, set forth the basis on which the contractor seeks relief, and identify a sum certain that the contractor seeks to recover." *United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 638 n.12 (2004) (citing *Reflectone*, 60 F.3d at 1575-76; *GPA-I, LP v. United States*, 46 Fed. Cl. 762, 766 (2000)).

[8]FAR 33.201, which the Federal Circuit analyzed in *Reflectone*, has been moved to FAR 52.233-1. *See* Federal Acquisition Regulation; Definition of "Claim" and Terms Relating to Termination, 67 Fed. Reg. 43,513, 43,514 (June 27, 2002) (codified at 48 C.F.R. Parts 2, 17, 31, 33, 49 and 52).

Based on this request and the related requests submitted to the Contracting Officer, this court concludes that Engineered Demolition filed a claim that satisfied the FAR definition and gave adequate notice to the Contracting Officer of the amount it was seeking and the basis for its request. *See* FAR 52.233-1; *Contract Cleaning Maint.,* 811 F.2d at 592. Engineered Demolition submitted its claim in writing, asserted its request for an equitable adjustment as a matter of right under the contract language, and sought damages in a sum certain amount. *See* Def.'s Mot. App. at 52, 59; FAR 52.233-1. Engineered Demolition never withdrew this claim under the Changes Clause and other portions of the contract.

In her final decision, the Contracting Officer denied plaintiff's request for an equitable adjustment. Def.'s Mot. App. at 63 (Contracting Officer's Final Decision (Sept. 25, 2002)). She never addressed the viability of Engineered Demolition's contentions with respect to either the constructive-changes doctrine or the Changes Clause despite the fact that plaintiff asserted both as bases for its claim, *see id*. at 54-57, although she expressly considered and rejected other grounds that Engineered Demolition had cited in support of its claim. *Id*. at 64-66. On this record, the court readily concludes that Engineered Demolition submitted a "clear and unequivocal statement that [gave] the contracting officer adequate notice of the basis for the claim." *Contract Cleaning Maint.*, 811 F.2d at 592. Her failure to acknowledge Engineered Demolition's reliance on the Changes Clause or its equivalent has no jurisdictional significance. *See CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760, 763 (2004) (citing *Contract Cleaning Maint.*, 811 F.2d at 592).

The government seeks to support its contention that Engineered Demolition did not properly present its equitable-adjustment claim to the Contracting Officer by arguing that Engineered Demolition did not set out all of the reasons for the alleged shortfall. Specifically, the government asserts that Engineered Demolition did not submit a valid claim because it did "not even mention the [Corps'] directive to use soil from the main pile to fill a previously created hole." Def.'s Mot. at 12. As the government would have it, Engineered Demolition's failure to present to the Contracting Officer one of the "change[s] upon which its claim is now based" is fatal to its claim. *Id*. at 13. This argument is untenable. The Contracting Officer manifestly was given effective notice of the claim. There is no requirement that a claim under the CDA be stated with the particularity that is required, for example, for an averment of fraud or mistake under RCFC 9(b). To the contrary, as the Federal Circuit has said, it

> know[s] of no requirement in the [CDA] that a "claim" must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.

*Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting *Contract Cleaning Maint.*, 811 F.2d at 592)); *see also Transamerica Ins. Corp. v. United States*, 973 F.2d

1572, 1578 (Fed. Cir. 1992) ("certain 'magic words' need not be used and the intent of the 'claim' governs"); *Farmers Grain Co. of Esmond v. United States*, 33 Fed. Cl. 298, 300 (1995) (under the CDA, alternative arguments may be raised in this court even though not presented to the contracting officer). The basis for Engineered Demolition's request for an equitable adjustment was the shortfall in the amount of material excavated and transported, not also each and every underlying reason for the shortfall.[9] The detailed pleading the government seeks is not required by the CDA.

Therefore, the court holds that Engineered Demolition has satisfied the jurisdictional prerequisites for presenting its equitable-adjustment claim to this court.

2. *The claim based upon the Changes Clause.*[10]

---

[9]Tellingly, the government contradicts itself in its own pleading. The government concedes that Engineered Demolition properly submitted a claim to the Contracting Officer with respect to the Corps' "alleged change in finish grade elevation." Def.'s Mot. at 13 n.4. However, Engineered Demolition never mentioned the change in grade elevation in its shortfall claim to the contracting officer, just as it did not mention use of soil from the main pile to fill a depression. *See* Def.'s Mot. App. at 52-59.

In its motion to dismiss, the government separately attacks Engineered Demolition's contention that a change in final grade elevation was a partial cause of the shortfall. The government argues that Engineered Demolition "disavowed" that reason for the shortfall in one of its responses to the government's interrogatories. Def.'s Mot. at 11. The government misinterprets plaintiff's responses. In Engineered Demolition's Interrogatory Answer Number 1 (Jan. 25, 2005), *see* Def.'s Mot. App. at 12, Engineered Demolition conceded that a changes clause had been included in the contract. Its allegations respecting the effect of a change in the finish-grade elevation happened to occur in the same paragraphs of its complaint. *See* Compl. ¶¶ 14-15. The court rejects the contention that Engineered Demolition's concession regarding the existence of a changes clause carried over also to elide Engineered Demolition's asserted finish-grade cause for the shortfall.

[10]Both parties have incorrectly implied that the doctrine of constructive change is applicable to the present case. *See* Pl.'s Opp. at 8; Def.'s Mot. at 14. A constructive change occurs when "a contract contains the standard 'changes' provision and the contracting officer, without issuing a formal change order, requires the contractor to perform work or to utilize materials which the contractor regards as being beyond the [contractual requirements]." *Ets-Hokin Corp. v. United States*, 420 F.2d 716, 720 (Ct. Cl. 1970); *see National Sur. Corp. v. United States*, 31 Fed. Cl. 565, 579 n.11 (1994) (quoting *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)), *aff'd on other grounds*, 118 F.3d 1542 (Fed. Cir. 1997); *Calfon Constr., Inc. v. United States*, 17 Cl. Ct. 171, 177 (1989) (citing *Len Co. & Assoc. v. United States*, 385 F.2d 438, 443 (Ct. Cl. 1967)). As commentators have stated, the constructive-change doctrine is a judicially-created adjunct to a changes clause in the contract:

The Changes Clause, FAR 52.243-1, which is incorporated into the contract, states that "[t]he Contracting Officer may at any time, by written order, . . . make changes within the general scope of this contract" in four different areas: the description of services under the contract, the time of performance, the place of performance, or "[d]rawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government, in accordance with the drawings, designs or specifications." Supp. Materials at 409 (Contract Section I: Contract Clauses). If such a change, per a written order, results in either an increase or decrease in the cost or time required for performance under the contract, the Contracting Officer "shall make an equitable adjustment in the contract price . . . and shall modify the contract." *Id*. at 410 (FAR 52.243-1(b)). The contractor, however, "must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order." *Id*. (FAR 52.243-1(c)).[11] If

---

> The doctrine of "constructive change" is a legal fiction created in the mid-20th century by the federal judiciary and federal boards of contract appeal to (1) remediate contractor claims for extra work, and (2) permit contractors to perform disputed work without having to risk abandonment of their contracts to preserve their claims. The theory underlying the constructive change concept is that where the government "should have" issued a change order authorizing the extra work in the first place, the court or board may direct the government to do what "should have been done" by directing the government to issue a formal change order. The doctrine in its modern guise is the embodiment of the ancient principle that "what should have been done will be done."

Philip L. Bruner and Patrick J. O'Connor, Jr., *Bruner and O'Connor on Construction Law* § 4:25 (2005) (footnote omitted).

The government correctly contends that a contractor may not seek an equitable adjustment, pursuant to the constructive-change doctrine, when the contractor volunteered to perform work. Def.'s Mot. at 14; *see Calfon Constr.*, 17 Cl. Ct. at 177. Nevertheless, the constructive-change doctrine does not apply in this case because the Contracting Officer issued a formal change order, albeit belatedly, Def.'s Mot. App. at 41-43 (Modification No. P00006), and therefore this argument by the government is irrelevant. Furthermore, sufficient evidence exists that Engineered Demolition did not volunteer to fill an existing depression with some of the material it was excavating, and thus this court cannot hold that summary judgment for the government is warranted on this basis. *See* Pl.'s Opp. App. at 8 (Dep. of Welch) at 28:3 to 29:1.

[11]Pursuant to FAR 252.243-7002, incorporated by full text into this contract, "[t]he amount of any request for equitable adjustment to contract terms shall accurately reflect the contract adjustment for which the Contractor believes the Government is liable." Supp. Materials at 426 (Contract Section I: Contract Clauses). Moreover, "[t]he request shall include only costs for performing the change . . . [and a]ll indirect costs included in the request shall be

the contractor and Contracting Officer are unable to agree on an equitable adjustment, the Disputes Clause, FAR 52.233-1, also incorporated into the contract, *id*. at 406-407, would govern the procedure by which a resolution is reached. *Id*. at 410 (FAR 52.243-1(e)).

The "written order" requirement for applicability of the Changes Clause has been in place for some time. *See General Bronze Corp. v. United States*, 338 F.2d 117, 123 (Ct. Cl. 1964) ("Long ago, the United States Supreme Court held that a failure to obtain from the department head a written approval for changes or extras is fatal to a contractor's recovery under a Government contract.") (citing *Plumley v. United States*, 226 U.S. 545 (1913)); *see also Conner Bros. Constr. Co. v. United States*, 65 Fed. Cl. 657, 678 (2005). In *Conner Brothers*, the parties had "merely entered into oral discussions . . . but a final modification was never issued by the contracting officer." *Id*. Consequently, the court concluded in that case that the remedies and procedures delineated under a changes clause were "inapplicable." *Id*.[12]

The government argues that this court lacks jurisdiction over part of Engineered Demolition's claim for equitable adjustment because it does not comport with the express language of the contract's Changes Clause. In effect, the government argues that a portion of the claim should be dismissed because there was no written order directing Engineered Demolition to fill in the depression, or in the alternative, even if there did exist such an order, Engineered Demolition failed to request an equitable adjustment within 30 days of its issuance. Def.'s Mot. at 13-14 ("[T]he record is entirely devoid of *any* complaint or request for an equitable adjustment stemming from the [Corps'] instruction concerning filling a previously created depression, let alone one made within thirty days of the change (which was communicated in writing by no later than October 1, 2001)."). The government, however, fails to consider the import of Modification Number P00006. Courts previously have equated a "written order" under the Changes Clause as including a "final modification" to the contract. *See, e.g., Conner Bros.*, 65 Fed. Cl. at 678. Here, the Contracting Officer issued such a "written order" on July 9, 2002 when she signed and executed Modification Number P00006, reducing the quantity of material excavated and transported and the attendant payment amount. Def.'s Mot. App. at 41-43 (stating that this modification was pursuant to the Changes Clause, FAR 52.243-1). This modification, changing the amounts listed in the contract's bidding schedule, memorialized and encompassed the results of the government's prior decisions to revise the final elevation of the finish grade and to fill the existing depression. Thereafter, in accordance with the terms of the Changes Clause, FAR 52.243-1(c), "within 30 days from the date of receipt," Engineered Demolition asserted its right

---

properly allocable to the change in accordance with applicable acquisition regulations." *Id*.

[12]Although this court interpreted FAR 52.243-4 in *Conner Brothers*, there are no substantive differences pertinent to the present analysis between that provision and FAR 52.243-1.

to an equitable adjustment when it filed its supplemental claim with the Contracting Officer on July 17, 2002. Def.'s Mot. App. at 52-59 (Letter from Chong to Wynne-George).[13]

The government implicitly recognizes that Modification Number P00006 would ordinarily serve as the predicate for application of the Changes Clause, but it counters that a Memorandum of Record, which it prepared and distributed to Engineered Demolition on October 1, 2002, summarizing matters discussed at a coordination meeting held on September 27, 2001, should be considered a "written order" under FAR 52.243-1. *See* Def.'s Mot. at 13. The government implicitly argues that any writing reflecting an instruction to perform an assignment that is outside the scope of the contract satisfies the requirement for a written order under the changes clause and triggers the 30-day period within which a contractor must assert its right to an equitable adjustment. *See id*. As noted previously, a "final modification" would constitute a written order for purposes of the Changes Clause. *See Conner Bros.*, 65 Fed. Cl. at 678. Moreover, an order, as defined by FAR 7.101, in writing likely would also be considered a written order for this purpose.[14] However, a memorandum that simply memorializes an oral discussion between the parties falls well short of constituting a written order under the Changes Clause. Accordingly, the Memorandum of Record, dated September 27, 2001, Def.'s Mot. App. at 46-48, is not a written order under FAR 52.243-1.

Therefore, the court denies the government's motions to dismiss and for summary judgment with respect to plaintiff's request for an equitable adjustment based upon an alleged shortfall in the material excavated and transported for disposal. Engineered Demolition's claim is jurisdictionally and procedurally proper under the Changes Clause of the contract. *See* Supp. Materials at 410 (FAR 52.243-1).

B. Breach of Contract

Engineered Demolition's claim for breach of contract mirrors its claim for equitable adjustment. Both address the shortfall of radiologically contaminated material that was excavated and transported for disposal. Accordingly, this is an instance where Engineered Demolition's breach of contract claim "arise[s] from the same operative facts, claim[s exactly] the same relief, and merely assert[s a] differing legal theor[y] for that recovery." *Scott Timber*,

---

[13]Engineered Demolition's prior submission of a claim with the Contracting Officer's Representative on February 10, 2002, and its receipt of a response on April 18, 2002, essentially were overtaken and superseded by Modification Number P00006, even though that earlier submission of a claim and the response may have prompted the Contracting Officer to issue Modification Number P00006. The earlier claim would have arisen under the constructive-claim doctrine, see *supra*, at 11-12 n.10, while Modification Number P00006 invoked and triggered the Changes Clause.

[14]As defined by the FAR, an "[o]rder means an order placed under a (1) Federal Supply Schedule contract; or (2) Task-order contract or delivery-order contract awarded by another agency." FAR 7.101.

333 F.3d at 1365 (affirming a trial court's holding that it possessed jurisdiction over plaintiff's claim made after a contracting officer's adverse final decision).

Pertinent to Engineered Demolition's breach of contract theory for recovery, an ambiguity existed in the solicitation with respect to the estimated amount of material to be excavated. The solicitation's bidding schedule stated that an estimated 8,080 cubic yards would be removed from the main pile at HISS, but Drawing Number C-3 explicitly noted that "total excavation" equaled "approximately 6,600" cubic yards. *See supra*, at 4-5. Upon discovering these contradictory figures, prior to submitting its offer and entering into negotiations for the contract, Engineered Demolition brought the discrepancy to the government's attention and asked the government which number was appropriate. *See* Def.'s Mot. App. at 73 (Deposition of Welch) at 62:10-18.[15] The government resolved the patent ambiguity and responded that it intended to pay for excavation of 8,080 cubic yards of material. *Id*. Accordingly, Engineered Demolition used that figure as the basis of its offer. *Id*.; Hr'g Tr. 21:16-18 ("Engineered Demolition understood that the estimate that the parties were working with was in fact based on 8,080."), 49:17-25 (Feb. 3, 2006). Ultimately, this figure proved to be incorrect because plaintiff excavated only approximately 6,677 cubic yards of material. *See supra*, at 6-7. Therefore, the government's response that 8,080 cubic yards was the correct estimate of how much material would be excavated serves as the basis for plaintiff's breach of contract claim.

The government first contends that Engineered Demolition's contract-breach claim should be dismissed for lack of subject matter jurisdiction on the ground that Engineered Demolition never raised this claim as the basis for a request for relief before the Contracting Officer. Def.'s Mot. at 16-17. The government neglects to consider Engineered Demolition's supplementation of its claim before the Contracting Officer. In a letter dated September 25, 2002, Engineered Demolition cited breach of contract as an additional basis for its request for

---

[15]Where a contract (or here, a solicitation) is ambiguous, a general starting point for choosing between competing interpretations is the doctrine of *contra proferentum*, which contemplates that ambiguities be construed against the drafter. *See Record Steel and Constr., Inc. v. United States*, 62 Fed. Cl. 508, 517 (2004) (citing *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004)). However, an exception to that general rule arises where the ambiguities are "so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *HPI/GSA-3C*, 364 F.3d at 1334 (quoting *Triax Pac., Inc. v. West*, 130 F.3d 1474-75 (Fed. Cir. 1997)). This "patent ambiguity doctrine" has not been given broad application because it "has the effect of relieving the government from the consequences of its own poorly drafted contracts." *Triax*, 130 F.3d at 1475. Nonetheless, here the ambiguity was glaring and obvious. Engineered Demolition thus had an obligation to raise the matter with the Corps before it submitted its offer in response to the solicitation, and Engineered Demolition fulfilled that obligation. *See id*. ("The existence of a patent ambiguity in a government contract 'raises the duty of inquiry.' . . . That duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor." (citations omitted)).

relief. *See* Def.'s Mot. App. at 61-62 (Letter from Kosonen to Wynne-George (Sept. 25, 2002)). Moreover, Engineered Demolition specifically averred that "[h]ad the true quantity [of contaminated soil to be excavated and transported] been represented claimant would not have bargained for the pricing that resulted." *Id*. at 61 (Letter from Kosonen to Wynne-George (Sept. 25, 2002)). In short, the supplements Engineered Demolition provided to the Contracting Officer satisfy the jurisdictional prerequisites in the CDA for submission to this court of a claim by Engineered Demolition for breach of contract. *See* FAR 52.233-1; *Scott Timber*, 333 F.3d at 1365-66; *Mills v. United States*, 69 Fed. Cl. 358, 363-64 (2006).

The government further asserts that summary judgment should be awarded in its favor on this claim because Engineered Demolition was on notice that any figure that the government offered was an estimate and "it is black-letter law that the Government is not presumed to have a crystal ball in setting estimated quantities." Def.'s Mot. at 17-18. While the government is generally provided with a measure of flexibility in determining the estimated quantities in its contracts, it nevertheless is bound by "an implied obligation . . . to 'act in good faith and use reasonable care in computing its estimated needs. . . . Failure to meet that obligation constitutes a breach of the resulting contract.'" *Rumsfeld v. Applied Cos., Inc.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003) (analyzing the duty of the government in providing estimated quantities in requirements contracts) (quoting *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992)); *see also United Med. Supply Co. v. United States*, 63 Fed. Cl. 430, 436 (2005). To prevail on such a claim for breach of contract, a contractor has the burden of proving that "the government prepared estimates 'inadequately or negligently,' 'not in good faith,' or [in a manner that was] 'grossly or unreasonably inadequate' at the time." *Federal Group, Inc. v. United States*, 67 Fed. Cl. 87, 97 (2005) (quoting *Rumsfeld*, 325 F.3d at 1335). "The common threads in the cases where courts have found estimates to be unreasonable are actual knowledge that the estimates were inaccurate or failure to take reasonable efforts to confirm doubtful estimates." *Federal Group*, 67 Fed. Cl. at 98 (analyzing the *Medart* and *Rumsfeld* decisions, as well as *Womack v. United States*, 389 F.2d 793 (Ct. Cl. 1968), and *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506 (1993)).

Here, both the solicitation and the contract stated that the unit quantities listed in the bidding schedule were "estimated quantities." Supp. Materials at 3, 230. The quantity listed on Drawing Number C-3 does not have a similar disclaimer, but it does state that the amount to be excavated is "approximately" 6,600 cubic yards. *Id*. at 455. The government does not defend its incorrect statement to Engineered Demolition that the appropriate quantity to be excavated was 8,080 cubic yards, and not 6,600 cubic yards. However, it argues by way of avoidance that it should not be held liable unless the estimate was "drastically inaccurate." Def.'s Mot. at 18. The government cites precedents where it was not liable when the discrepancy in a requirements contract between the estimated quantity and the ultimately realized amount was larger than in the present matter. *Id*. (citing *Medart*, 967 F.2d at 580; *Federal Group*, 67 Fed. Cl. at 98-99; *Crown Laundry*, 29 Fed. Cl. at 519). The central issue in this case, however, is not the extent to which the government's estimate was inaccurate, but rather whether the government was negligent or failed to act in good faith when it responded to Engineered Demolition's inquiry about the

quantity that was to be used as a basis for an offer, *i.e.*, 8,080 rather than 6,600 cubic yards. *See Rumsfeld*, 325 F.3d at 1335 (holding that the procuring agency had a duty to inform the successful bidder that orders would be significantly below the estimates in a request for proposals where that fact was known before the contract award). On this issue, the government has failed to satisfy its burden on summary judgment.

With respect to a motion for summary judgment, this court must resolve all inferences "'in the light most favorable to the party opposing the motion.'" *Matsushita*, 475 U.S. at 587-88 (quoting *Diebold,* 369 U.S. at 655). When asked to resolve the patent ambiguity in the solicitation, the government affirmed the higher estimate, 8,080 cubic yards, not the lower figure that proved to be more accurate as events transpired. The record, as it presently exists, reflects no rationale or justification for the government's affirmation of the higher estimate. Consequently, the court cannot hold that the government did not breach the contract as a matter of law.

## CONCLUSION

For the reasons stated, the government's motion for partial dismissal of Engineered Demolition's complaint for lack of subject matter jurisdiction is DENIED. The government's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The court grants summary judgment in favor of the government on count one of Engineered Demolition's complaint. In all other respects, the government's motion for summary judgment is denied.

The parties are requested to confer and to provide this court by May 1, 2006, with a Joint Status Report that sets out a proposed post-discovery, pretrial schedule in accord with RCFC Appendix A, ¶¶ 12-17. Thereafter, a status conference shall be held on May 11, 2006, commencing at 2:00 p.m. at the National Courts Building, 717 Madison Place, N.W., Washington, DC. The courtroom in which the conference will be held shall be posted in the lobby of the building.

IT IS SO ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge